Tamra Lea McKINNEY, Plaintiff,

v.

K–MART CORPORATION, Defendant.

Civ. A. No. 2:86–0354.

United States District Court,
S.D. West Virginia,
Charleston Division.

Dec. 8, 1986.

Gerald R. Lacy, Charleston, W. Va., for plaintiff.

Cheryl Harris Wolfe and John M. Slack, III, Charleston, W. Va., for defendant.

## MEMORANDUM OPINION AND ORDER

HADEN, Chief Judge.

### I. *Background*

Tamra McKinney,[1] the Plaintiff, was employed by K–Mart at its Kanawha City,

---

1. The Plaintiff has married since the institution of this action. Although the last name is now

West Virginia store from September 5, 1980, to April 30, 1982, and then again from March 15, 1983, until March 6, 1985.[2] This litigation has its genesis in McKinney's second term of employment with K–Mart.

Employed in the layaway department, McKinney had become the senior employee of that department by early 1985. She was primarily responsible for determining the balance due on all items remaining in the layaway, a procedure known as "running the tape." When the Plaintiff was absent from work one day in 1985, another employee ran the tape. That employee discovered a shortage of $16,000 to $17,000. McKinney returned to work and justified the discrepancy by explaining that 200 to 250 active ledger cards had been mistakenly placed in the inactive files. Other employees have testified that no one except McKinney saw these misplaced cards.

In late February, 1985, an internal auditor from K–Mart headquarters conducted an audit of the Kanawha City store.[3] On February 28, 1985, the auditor and McKinney ran a tape to determine the balance due on the ledger cards. A discrepancy of approximately $19,000 was discovered between the accounts receivable sum and the cash office and the balance due figure on the ledger cards. On this occasion, no active ledger cards were found misplaced in the inactive file. The shortage stood at approximately $19,000.

Over the next few days the employees of the layaway department were interviewed by local management. Between March 1 and March 5, 1985, McKinney met almost daily with her supervisors. She has testified that these meetings with Barry Green, Donald Ericson, Jr. and Edna Chapman did not have a threatening tone. Those individuals did ask her a lot of questions. McKinney testified at her deposition that the K–Mart officials above named "wanted to

know if I had any ideas of where [the money] might have went, what could have happened to it, basically what I thought of the whole situation." McKinney's deposition at 65. McKinney testified that these officials did not raise their voice with her and that she was not accused of wrongdoing.

On March 6, 1985, K–Mart's District Manager, Charles Mayersky, and Loss Prevention Manager, Deborah Vandercher, met twice with McKinney. A two-hour meeting in the morning was similar to those had with the local officials. McKinney was questioned about procedures and asked what she knew about the situation. Vandercher did not accuse McKinney of wrongdoing, but stated that she believed McKinney knew how the shortage had occurred.

McKinney alleges that in the afternoon session Vandercher called her a liar and told her to "cut the crap." According to McKinney, Vandercher also slammed her hand on the table. McKinney became upset and stated that she would not tolerate being called a liar. She informed Vandercher and the other officials at the meeting that she was resigning; she then left the room.

McKinney spoke to Green, Chapman and Ericson after the meeting. She was still quite upset and apparently screamed in their presence that she was "not going to called a liar," and she "didn't steal anything." McKinney deposition at 102–03. She repeated her intention to resign. All three of the officials attempted to dissuade her from quitting. She rejected their overtures, however, and soon thereafter left the store with her husband. March 6, 1985, proved to be her last day of employment with K–Mart.

McKinney instituted this action alleging that K–Mart was liable for slandering her

Ramey, the Court will employ her maiden name, that name still being officially of record.

**2.** McKinney left K–Mart in April of 1982 to get married. The wedding, however, was postponed and she was able to return to K–Mart.

**3.** The record does not indicate whether the audit was normal procedure or whether it was precipitated by the unusual occurrence of January, 1985.

and that it had engaged in outrageous conduct. On October 24, 1986, McKinney filed an amended complaint in which she added a cause of action for breach of contract. K-Mart now moves for summary judgment as to all three of the theories advanced by McKinney.

## II. *Discussion*

### A. *Breach of Contract*

■ The parties appear to discern two theories emanating from the count added in the amended complaint. McKinney argues that K-Mart breached an implied contract not to terminate her except for cause. K-Mart, on the other hand, argues that the only theory properly alleged in the amended complaint is a breach of an implied-in-law covenant of good faith and fair dealing. Recent case law explains why the parties take their respective positions. The West Virginia Supreme Court of Appeals has recognized an implied employment contract as a narrow exception to the employment-at-will doctrine. *Cook v. Heck's, Inc.*, 342 S.E.2d 453 (W.Va.1986). Conversely, the Fourth Circuit, applying West Virginia law, has flatly rejected an implied-in-law covenant of good faith and fair dealing. *Speelman v. Smith's Transfer Corp.*, 790 F.2d 889 (4th Cir.1986) (unpublished opinion).[4]

The parties expend much effort arguing over which theory the Plaintiff has alleged. Moreover, they go to great lengths in their arguments on the question of whether the facts here fall under the *Cook* holding. The Court, however, believes this issue may be resolved on a threshold consideration. Did McKinney voluntarily resign or was she discharged? If the answer is that McKinney voluntarily resigned, then the quite involved issues raised by the application of the *Cook* decision need not be addressed.

As an initial matter, the Court notes that McKinney was not fired in the ordinary sense. That is, she was not told by anyone at K-Mart that her employment was terminated. She chose to resign. The only remaining inquiry then is one directed to the question of whether McKinney was "constructively discharged." In this vein, McKinney alleges that she "was forced to quit [her] employment with [K-Mart] on March 6, 1985, because of the malicious, wrongful, negligent, outrageous, careless, intentional and reckless acts of [K-Mart]...."

McKinney offers no argument and cites no authority to support her apparent assertion that she was constructively discharged. The Court's research reveals no West Virginia cases which discuss the theory. In the context of a Title VII suit, however, the Fourth Circuit has held that to establish a constructive discharge the employee must have been subjected to intolerable working conditions, thus forcing the employee to quit. Also, "the employer's actions must be intended by the employer as an effort to force the employee to quit." *EEOC v. Federal Reserve Bank of Richmond*, 698 F.2d 633, 672 (4th Cir. 1983), reversed on other grounds *sub nom, Cooper v. Federal Reserve Bank*, 467 U.S. 867, 104 S.Ct. 2794, 81 L.Ed.2d 718 (1984) (*quoting, Irving v. Dubuque Packing Co.*, 689 F.2d 170, 172 (10th Cir.1982)). In determining that the employee in *Federal Reserve Bank* was not constructively discharged, the Fourth Circuit was persuaded in part by the fact that a supervisor of the employee had attempted to persuade her not to quit. Similar facts here bear upon the intent *vel non* of K-Mart to force McKinney to quit. Not one but three officials asked her not to resign. The Plaintiff has offered no rebutting evidence on this issue.

After reviewing the deposition excerpts of record, the Court must conclude that McKinney voluntarily left her employment with K-Mart. Given the nature of her last meeting with Vandercher, McKinney possibly believed that her future relationship with K-Mart would be one of mistrust and

---

**4.** Being an unpublished opinion, the Court finds the *Speelman* authority to be persuasive authority at most.

unpleasantness. This is counterbalanced, however, by the lack of hostility exhibited by her immediate supervisors and their professed desire that she remain with the store. In short, there is no evidence, circumstantial or direct, that K–Mart formulated any scheme to force McKinney from her job. Having voluntarily severed her relationship with K–Mart, McKinney cannot succeed on a theory that the company discharged her in violation of the terms of any implied contract.

The Court finds no merit in McKinney's allegation that her employment relationship with K–Mart carried with it an implied covenant of good faith and fair dealing. As mentioned, the *Speelman* court found no such covenant to exist in West Virginia law. Moreover, this Court has had occasion to note that mistreatment alone in the employment context does not give rise to a legally cognizable claim for damages. *Murray v. Kaiser Aluminum & Chemical Corp.*, 591 F.Supp. 1550, 1554 (S.D.W.Va. 1984).

### B. *Tort of Outrage*

■ McKinney contends that the acts of the K–Mart officials were so outrageous and extreme as to form the basis for a cause of action for "outrage." Both parties agree that as to this tort the Court must initially determine whether the facts are such as to permit a jury award. *See Restatement (Second) of Torts*, § 46 comment h; *Koch v. Goldway*, 607 F.Supp. 223 (C.D.Cal.1984); *Briggs v. Rosenthal*, 327 S.E.2d 308 (N.C.App.1985). Accordingly, the Court has thoroughly reviewed all facts of record. Upon such review, the Court is left with the indelible impression that this is not a case containing facts which can support a theory of outrage.

The Plaintiff's counsel, through conclusory statements and hyperbole, tries to lift this up to the high plateau established by the case law as the level at which the tort of outrage takes life. The uncontroverted facts of record prevent him from doing so, however.

The relevant facts need not be restated in great detail. Simply put, this litigation is about the disappearance of $19,000 under circumstances which cast suspicion on Ms. McKinney. As was their duty, the management of K–Mart set about to determine how this loss occurred. Given the circumstances, it is understandable that tempers might flare or that feelings might be hurt. Significantly, McKinney cites only one meeting in which her interrogator became abusive. The series of interrogations, by their mere number, do not constitute outrageous conduct. Perhaps certain of the officials at K–Mart could have exercised greater diplomacy, but their shortcomings certainly cannot be characterized as "cold blooded," or "inhumane." Nor did their conduct fall below generally accepted standards of decency and morality.

Finding no need for further amplification, the Court concludes that the Plaintiff does not have a viable theory of outrage.

### C. *Slander*

In the briefing of this summary judgment motion, several incidents have been alluded to as the basis for McKinney's slander claim. Although McKinney appears to abandon some of these incidents—she does not argue their merit in her responsive memorandum—the Court will address each in turn.

McKinney testified that William Burke, a security guard at her former store, told Joe McCune, a security guard at the K–Mart store where her fiance worked, about the incident involving McKinney at the Kanawha City store. When asked what Burke had said to McCune, the Plaintiff replied as follows:

> "His exact words were that he needed to watch Gene, told him about the shortage, told him that I had quit and why I had quit, just informed him that he needed to watch Gene, and it had nothing to do with Gene."

McKinney deposition at 117.

K–Mart offers two defenses to this charge of slander: truth and the exercise of a qualified privilege. First, as to truth,

no more need be said than to note that such is an absolute defense to slander. West Virginia Constitution, art. III, § 8; *McClaugherty v. Cooper*, 39 W.Va. 313, 19 S.E. 415 (1894). If the statement as made is true, then it is not actionable. In this instance, the Plaintiff's own testimony reveals that Burke said no more than the truth. There had been a shortage in layaway at the Kanawha City Store, the Plaintiff was being investigated and she had quit.

■ Second, it also clear that the statement made by Burke enjoys a qualified privilege. A qualified privilege exists when a person publishes a statement in good faith about a subject in which he has an interest or duty and limits the publication of the statement to those persons who have a legitimate interest in the subject matter. *Mauck v. City of Martinsburg*, 280 S.E.2d 216 (W.Va.1981). The privilege is founded on the policy of fostering the free flow of information in certain settings. One of those settings is the employer-employee relationship. *See Mauck, supra: Parker v. Appalachian Electric Power Co.*, 30 S.E.2d 1 (W.Va.1944). In making his statement to McCune, Burke was merely discharging his duty as a security officer. Moreover, he limited his statement to someone who had a legitimate interest in learning the information, another security officer. Therefore, the law raises a prima facie qualified privilege in favor of the occasion. *City of Mullens v. Davidson*, 57 S.E.2d 1 (W.Va.1949).

That a qualified privilege covers a particular occasion does not mean that an action for slander may not lie. A qualified privilege by definition can be abused. A showing of any of the following will defeat a qualified privilege:

1. Actual malice;

2. An intentional publication of false defamatory material;

3. A publication of false defamatory material and reckless disregard for its truth or falsity;

4. A publication of false defamatory material made to persons who have no reason to receive the information; or

5. A publication of false defamatory material with a primary purpose unrelated to the purpose of the privilege. *Crump v. Beckley Newspapers, Inc.*, 320 S.E.2d 70, 78 (W.Va.1984). The Plaintiff has failed to raise a genuine issue of fact as to any of these categories. Whether a conditionally privileged occasion was abused is a question of law for the Court when there is an absence of controversy as to the facts bearing thereon. *City of Mullens, supra; Parker, supra; Porter v. Eyster*, 294 F.2d 613 (4th Cir.1961). Hence, the Court concludes that the statements made by Burke were protected by a qualified privilege.

■ In her deposition, McKinney makes reference to the occasion a collection agency employee called her to inquire about an outstanding debt. McKinney seems to imply that K–Mart had communicated a slander to this bill collector. She only quotes the bill collector, however, as saying that K–Mart told her (the bill collector) that McKinney had been fired. K–Mart produces the deposition of Amy Smith, the bill collector, wherein she testifies that her knowledge of McKinney's departure from K–Mart came from the Plaintiff herself. Whether these conflicting accounts constitute a factual dispute is immaterial, however, because the Plaintiff's version does not include actionable slander. At the most, she only has K–Mart informing Smith that McKinney has been fired. That this is not slanderous can be seen by the Plaintiff's own characterization of her employment separation as a "firing."

Perhaps in an attempt to make a showing of "malice," the Plaintiff has attached as an exhibit to her memorandum a copy of the first page of Vandercher's (Loss Prevention Manager) investigation report. The Plaintiff points out that on that report she is identified as "Suspect No. 1." The Court fails to see how this report provides any evidence of malice. In defamation law, malice has a narrow meaning. *Sprouse v.*

*Clay Communication, Inc.,* 211 S.E.2d 674 (W.Va.1975). It requires not only a deliberate intent to injure, but also an intent to injure through the publication of false or misleading defamatory statements known by the publisher or its agents to be false. Alternatively, malice can be manifested by an intent to injure through publication of such statements with reckless and willful disregard for their truth. *Id.* As the Plaintiff acknowledges, the document obtained from K–Mart's files merely demonstrates what K–Mart's "actual belief" was at that time. There is no evidence that K–Mart's management did not believe what they were writing.

The Plaintiff does not argue that the document referred to above constitutes a libel. She cannot. The report was prepared by a K–Mart official within the scope of her duty and was quite restricted in its publication. The report, therefore, is covered by a qualified privilege.

■ The most serious of the Plaintiff's allegations is the one regarding a statement supposedly made by Edna Chapman to Larry Sexton. He alleges in an affidavit prepared in opposition to the instant motion that "Edna Chapman told [him] that Tamra McKinney had been taking money out of the layaway department." Sexton affidavit at 1. He further states that Chapman told him that McKinney was a suspect. Chapman also inquired of Sexton as to how the Plaintiff could make both a car payment and a trailer payment on her salary. The context of these allegedly defamatory statements is crucial. At the time they were made, Chapman was personnel manager of the Kanawha City store. Sexton was the resident assistant manager. Consequently, if Chapman had reasonable belief that McKinney was guilty of wrongdoing she was obliged to communicate that belief to someone of Sexton's position. Given the circumstances, a qualified privilege covers the occasion. The burden of defeating the privilege falls upon the Plaintiff. Of course, at this point, she must simply create a genuine issue of material fact. This she has failed to do. The affidavit of Sexton merely helps raise the presumption.

McKinney has failed to produce any evidence of malice or ill will toward her by K–Mart's management which would bear upon whether the qualified privilege enjoyed by K–Mart was abused. For instance, there is no evidence that the maker of the last discussed statement, Ms. Chapman, bore ill feelings toward McKinney. Indeed, Chapman attempted to dissuade McKinney from resigning after the rocky interrogation with Vandercher.

Moreover, the Plaintiff has failed to produce evidence that K–Mart management overpublished its statements about McKinney by spreading the information to the general work force. The uncontroverted facts show that the Plaintiff herself was a source of information on the investigation. On March 6, 1985, her last day at work, in a loud voice in front of other employees, McKinney shouted, "I can't take no more of this. I am not going to be called a liar. I didn't steal anything." McKinney deposition at 102–03. The only additional evidence offered by the Plaintiff are vague allegations that "other employees" knew about the accusations being leveled against the Plaintiff. *Rule* 56(e) makes abundantly clear, however, that a party opposing a summary judgment motion may not rest upon the allegations of her pleadings. It is her burden to "set forth specific facts showing that there is a genuine issue for trial." The Supreme Court has emphatically driven this point home with its recently announced trilogy of cases on the summary judgment procedure. *See Matsushita Electric Industry Co. Ltd. v. Zenith Radio Corp.,* —— U.S. ——, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Anderson v. Liberty Lobby, Inc.,* —— U.S. ——, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); and *Celotex Corp. v. Catrett,* —— U.S. ——, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Court has rejected the notion that a "metaphysical doubt as to the material facts" can defeat a summary judgment motion. *Matsushita Electric Industry Co.,* 106 S.Ct. at 1356.

### III. *Conclusion*

The following passage from the *Celotex* decision illustrates the Supreme Court's "new" view of the burden thrust upon the nonmoving party by *Rule* 56:

"In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial. The moving party is 'entitled to judgment as a matter of law' because the non-moving party has failed to make a sufficient showing of an essential element of her case with respect to which she has the burden of proof."

*Catrett*, 106 S.Ct. at 2552–53. The Court finds that the Plaintiff has not met her burden here and that summary judgment is appropriate for the Defendant on all three counts of the Plaintiff's complaint. An appropriate order will issue.