Berneda R. O'SHEA, Plaintiff–Appellant,

v.

COMMERCIAL CREDIT CORPORATION, Defendant–Appellee.

No. 90–2374.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 30, 1990.

Decided April 11, 1991.

W. Michel Pierson, argued (Robert L. Pierson, Pierson, Pierson & Nolan, on brief), Baltimore, Md., for plaintiff-appellant.

Jeffrey Peabody Ayres, argued (Brenda J. Tranchida, Peter S. Saucier, Venable, Baetjer & Howard, on brief), Baltimore, Md., for defendant-appellee.

Before HALL and NIEMEYER, Circuit Judges, and CACHERIS, United States District Judge for the Eastern District of Virginia, sitting by designation.

CACHERIS, District Judge:

The appellant, Berneda R. O'Shea, instituted this action against appellee Commercial Credit Corporation alleging a violation of the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. §§ 621 *et seq.* ("ADEA"). On April 3, 1990, the district court, finding no genuine dispute of material fact, granted summary judgment in favor of Commercial Credit, having determined that the appellant signed a valid release of her ADEA rights in an employment termination agreement and, alternatively, that she subsequently ratified that agreement. 734 F.Supp. 218. O'Shea appeals from that decision, and we now affirm.

### I.

O'Shea had been employed by Commercial Credit for 27 years as a programmer/analyst before being laid off from work on August 14, 1987. That morning, she had been sitting at her desk when her immediate supervisor, Barbara Spedalire, came by and asked her to step in to her office. O'Shea did so and was thereupon informed that her position with the company had been terminated. As a result, she began crying hysterically.

Spedalire then handed her a document which, in relevant part, stated that O'Shea would agree to release any claims she might have against her employer in exchange for certain severance benefits. These benefits included: (1) normal base pay through September 11, 1987, (2) all unused, accrued vacation through the last

day worked, (3) 27 weeks severance pay, and (4) a "determination" that she would be considered to be on unpaid leave of absence through November 3, 1987. The last of these benefits would serve to bridge her until her 55th birthday and enable her to elect early retirement benefits. Furthermore, the "bridging" plan enabled O'Shea to lose only 42% of her pension as opposed to the 50% she would have lost had she not been bridged. It also resulted in certain insurance advantages.

In return for these benefits, O'Shea agreed to:

release Commercial Credit ... to the fullest extent permitted by law, from any and all claims relating in any way to the terms, conditions, and circumstances of [her] employment, whether based on statutory or common law claims, for employment discrimination (*including claims of age discrimination*), breach of contract ... or [any] other theory, whether legal or equitable.

(Emphasis added.) The document further recited that O'Shea would be given five days to sign and return it or her chance to obtain the aforementioned severance benefits would be lost.

The appellant returned home that day extremely dysphoric and dejected. As the sole source of support for the two grandchildren who live with her, she became very frightened and depressed and spent the entire weekend in a "state of agony."

On the following Monday, August 17, O'Shea consulted with her personal attorney, Joseph Askin, because she wanted to know if the release "was a legal document." He advised her that he did not specialize in employment law and confessed that he was not the appropriate person to help her. She then consulted another lawyer, Jerome Blum, who informed her that he could not assist her until she provided him with additional information which she did not possess at that time. Nevertheless, in a later deposition, she testified that both lawyers had advised her "that they weren't sure that it was legal." O'Shea then discussed the situation with her brother and several close friends, but eventually decided to sign and return the agreement because she saw "no alternative [and] could not afford to lose the benefits set forth in the document."

A few weeks later, Spedalire agreed to a subsequent request made by O'Shea that the severance pay be deferred until January 1988. That agreement was then embodied in a separate document, signed September 9, 1987.

In an affidavit, O'Shea stated that it was her impression that the severance pay (one week's worth for every year's service to the company) and the bridging provision were standard benefits she was "entitled to receive under existing company policy." Moreover, in her deposition, she further stated that neither she nor two other recently laid-off employees with whom she had discussed the matter had ever heard that the severance benefits would be unavailable unless the terminated employee signed a release.

Dorothy Wade, Commercial Credit's Director of Human Resources, stated that the company had been a subsidiary of the Control Data Corporation until it was spun off in November 1986. Shortly thereafter, in January 1988, new policies were instituted. One of those policies was that employees would not receive severance pay unless they first agreed to sign a form which released the company from all claims. This policy was eventually reduced to writing in the fall of 1987. O'Shea testified that she knew of no persons who had received severance benefits after December 1986 without signing the form.

Some time after she signed and returned the separation document, she was informed by a friend that Commercial Credit had taken out an employment advertisement in the August 16, 1987 edition of the Baltimore Sun newspaper. O'Shea also learned subsequently that the company had hired new analysts in the very department in which she had been working. Accordingly, she pointed out that she had no reason to believe that age discrimination may have been a motive for her termination until after she had already signed the release.

Recently, the appellant described the situation at Commercial Credit in great detail in a very articulate letter that she sent to U.S. Senator Barbara Mikulski. In that letter, she also explained her own personal dilemma and stated that she "purposely avoided [filing an] age discrimination action" against the appellee until the deferred severance benefits were paid to her.

## II.

█ The issue in this case is whether the release that O'Shea signed, in which she agreed to waive her federal ADEA rights in return for the severance pay and other consideration, was valid under the applicable law. The trial court held that it was.

In *Gilmer v. Interstate/Johnson Lane Corp.*, 895 F.2d 195 (4th Cir.1990), the court noted that employees may settle their ADEA claims against employers without EEOC involvement. This has been the consensus of the other circuits which have considered the question. *See O'Hare v. Global Natural Resources, Inc.*, 898 F.2d 1015, 1016 (5th Cir.1990); *Bormann v. AT & T Communications, Inc.*, 875 F.2d 399, 401–02 (2d Cir.), *cert. denied,* — U.S. —, 110 S.Ct. 292, 107 L.Ed.2d 272 (1989); *Coventry v. United States Steel Corp.*, 856 F.2d 514, 517 (3d Cir.1988); *Lancaster v. Buerkle Buick Honda Co.*, 809 F.2d 539, 540 (8th Cir.), *cert. denied,* 482 U.S. 928, 107 S.Ct. 3212, 96 L.Ed.2d 699 (1987); *Runyan v. National Cash Register Corp.*, 787 F.2d 1039, 1043 (6th Cir.) (en banc), *cert. denied,* 479 U.S. 850, 107 S.Ct. 178, 93 L.Ed.2d 114 (1986).

Nevertheless, the appellant contends that, in view of recent congressional action suspending operation of an EEOC regulation which permits the unsupervised waiver of ADEA claims, courts should "scrutinize ... very carefully" any release of ADEA rights.[1] Put simply, O'Shea is inviting this court to accord special significance to acts of Congress which have done no more than leave the law in its nascent state on the issue of unsupervised waivers. We decline that invitation.

There is no dispute among the circuits that employees may validly waive their federal ADEA rights in private settlements with their employers, provided that their consent to a release is both knowing and voluntary. *See also Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 52, 94 S.Ct. 1011, 1021, 39 L.Ed.2d 147 (1974) (Title VII rights presumably may be waived if employee's consent to the settlement was knowing and voluntary). The circuits are split, however, as to the appropriate source of law to be used in assessing the validity of a particular waiver.

The Second, Third, and Fifth Circuits apply a more stringent federal "totality of the circumstances" test, on the grounds that the congressional purpose of eliminating discrimination in employment is better served thereby. *See Bormann,* 875 F.2d at 403; *Coventry,* 856 F.2d at 523; *O'Hare,* 898 F.2d at 1017. Applying the "totality of the circumstances" test, courts have looked to several factors in order to assess the validity of a particular release. These factors include: (1) the plaintiff's education and business experience, (2) the amount of time the plaintiff had possession of or access to the agreement before signing it, (3) the role of the plaintiff in deciding the terms of the agreement, (4) the clarity of the agreement, (5) whether the plaintiff was represented by counsel or consulted an attorney, and (6) whether the consideration given in exchange for the waiver exceeded the employee benefits to which the employee was already entitled by contract or law. *Bormann,* 875 F.2d at 403, *quoting EEOC v. American Express Publishing Corp.*, 681 F.Supp. 216, 219 (S.D.N.Y.1988). The *Bormann* court modified the fifth factor of this test to include "whether an employer encourages or discourages an employee to consult an attorney and whether the em-

---

1. In 1987, the EEOC promulgated a regulation stating that "it has been found necessary and proper in the public interest to permit waivers or releases of claims under the Act without the Commission's supervision or approval...." 29 C.F.R. § 1627.16(c)(1). In appropriations bills from 1988 through 1990, however, Congress has subsequently suspended the operation of this provision. Pub.L. No. 100–202, 1987 U.S.Code Cong. & Admin.News (101 Stat.) 1329–31; Pub.L. No. 100–459, 1988 U.S.Code Cong. & Admin.News (102 Stat.) 2216; Pub.L. No. 101–162, 1990 U.S.Code Cong. & Admin.News (103 Stat.) 1020.

ployee had a fair opportunity to do so." *Id.* at 403 (citation omitted).

On the other hand, the Sixth and Eighth circuits have agreed that ordinary contract principles should be applied in determining whether a release was knowingly and voluntarily given. *Runyan,* 787 F.2d at 1044, n. 10; *Lancaster,* 809 F.2d at 541. Likewise, in *Riley v. American Family Mut. Ins. Co.,* 881 F.2d 368, 371–73 (7th Cir. 1989), the court noted a split both in its own circuit and in others as to which body of law would be most appropriate, but found it unnecessary in the circumstances of that case to "create a distinct body of federal law to interpret a plaintiff's release of federal rights."

■ We believe that the better approach is to analyze waivers of ADEA claims under ordinary contract principles, and, thus, we adopt the position taken by the Sixth and Eighth Circuits.[2] Accordingly, we turn to the appropriate state's law for guidance: Maryland law recognizes a release to be nothing but an ordinary contract and, accordingly, it provides that a party may set aside a release for the same reasons that it may void a contract. *Parish v. Maryland & Virginia Milk Producers Ass'n,* 261 Md. 618, 692, 277 A.2d 19, 54 (1971), *cert. denied,* 404 U.S. 940, 92 S.Ct. 280, 30 L.Ed.2d 253 (1971).

■ There cannot be any doubt that O'Shea's decision to execute the agreement was voluntary, deliberate, and informed. The release unambiguously stated that age discrimination claims would be waived. Moreover, O'Shea also received substantial consideration in exchange for the release.[3] Certainly, there was no fraud perpetrated by Commercial Credit, and any claims of economic duress are rebutted by O'Shea's decision to defer receipt of the severance pay until the following January.

### III.

■ In the alternative, we hold that even if the release executed by the appellant was invalid, the appellee would have prevailed on the ground that the appellant's subsequent acceptance of the severance pay demonstrated an intent to ratify the agreement. It is a well-established proposition that the retention of the benefits of a voidable contract may constitute ratification. *See, e.g., In re Boston Shipyard Corp.,* 886 F.2d 451, 455 (1st Cir.1989) ("It is well-settled ... that 'a contract or release, the execution of which is induced by duress, is voidable, not void, and the person claiming duress must act promptly to repudiate the contract or release or he will be deemed to have waived his right to do so.'" (citation omitted); *Anselmo v. Manufacturers Life Ins. Co.,* 771 F.2d 417, 420 (8th Cir.1985) (plaintiff signed a release under threat of losing severance pay, then sued to rescind, claiming duress, and court held for defendant on ground that the employee accepted benefits and thereby ratified the contract).

O'Shea attempted to avoid this result by arguing that she accepted the severance

**2.** The trial judge held that the release signed by O'Shea satisfied both the "totality of the circumstances" test and ordinary contract principles.

**3.** The appellant contends that the $23,371.20 in severance pay which she received was an entitlement which had already accrued to her and, accordingly, it could not be deemed consideration given for the release. Relying on basic contract principles, she contends that her continued work for the company was done with the expectation that she might eventually receive the severance pay.

In *Holland v. Burlington Industries,* 772 F.2d 1140 (4th Cir.1985), *cert. denied,* 477 U.S. 903, 106 S.Ct. 3271, 91 L.Ed.2d 562 (1986), however, this court held that severance pay arrangements, whether funded from general assets or from a special trust, were governed by ERISA.

Accordingly, the court in *Sejman v. Warner–Lambert Co., Inc.,* 889 F.2d 1346, 1348–49 (4th Cir.1989) (en banc), *cert. denied,* — U.S. —, 111 S.Ct. 43, 112 L.Ed.2d 19 (1990), reasoned that "[b]ecause, under ERISA, severance benefits are contingent and unaccrued, an employer may unilaterally amend or eliminate the provisions of a severance plan...."

To the extent, then, that contract principles are implicated, they are entirely preempted by ERISA. In *Holland,* 772 F.2d at 1147, the court relied on the "unparalleled breadth" of ERISA preemption when it held that severance pay matters were exclusively federal concerns.

In sum, O'Shea received approximately $23,000 (not including notice pay and unused, accrued vacation pay) and a "bridging" arrangement, which saved her some pension losses, in consideration for her agreement to waive any ADEA claims that she might have had.

pay because she believed it to be her entitlement and not because she intended to ratify the agreement. Yet, in the letter she mailed to Senator Mikulski, she stated that she "purposely avoided [filing an] age discrimination action" until she received her severance payment. Clearly, O'Shea sought to have it both ways, and that is something which the doctrine of ratification was designed not to permit.

### IV.

In sum, the district judge properly granted summary judgment for the defendant. There were no genuine issues of material fact, and it is clear that Commercial Credit was entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). O'Shea validly released her ADEA rights under both federal and state law and, moreover, she subsequently ratified the agreement by accepting both the severance pay and the other continuing benefits of the termination package. Accordingly, the opinion of the court below is

AFFIRMED.