Arthur **TOBIN**, et al., Plaintiffs,

v.

**RAVENSWOOD ALUMINUM CORPORATION,**
Defendant.

Civ. A. No. 6:92–0906.

United States District Court,
S.D. West Virginia,
Parkersburg Division.

Nov. 15, 1993.

Civ. Action No. 82–0452 (W.D.Va. Oct. 27, 1983); *Dent v. Ohlinger*, Civ. Action No. 78–0066(c)

(W.D.Va. Dec. 20, 1979).

·Fred ,F. Holroyd, Brian D. Yost, Scott Evans, Holroyd & Yost, Charleston, WV, for plaintiffs.

Ricklin Brown, Charles M. Love, III, Bowles, Rice, McDavid, Graff & Love, Charleston, WV, Peter G. Nash, Bernard P. Jeweler, Ogletree, Deakins, Nash, Smoak & Stewart, Washington, DC, for defendant.

David M. Goldenberg, James I. Stealey, Goldenberg, Goldenberg & Stealey, Parkersburg, WV, for movants.

### MEMORANDUM OPINION AND ORDER

HADEN, Chief Judge.

Pending are cross motions for summary judgment filed by the Plaintiffs and the Defendant. For reasons discussed below, the Court GRANTS Defendant's motion with respect to the 721 workers who signed releases. Regarding the 184 remaining Plaintiffs, the Court DENIES the Defendant's motion for summary judgment on counts one and three, with the exception of the count one claim for punitive damages, and GRANTS the Defendant's motion for summary judgment on counts two and five. Lastly, the Court DENIES Plaintiffs' motion for partial summary judgment.

Under *Rule 56(c)* of the Federal Rules of Civil Procedure, summary judgment is proper only:

> "[I]f the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law."

A principal purpose of summary judgment is to isolate and dispose of meritless litigation. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The moving party has the initial burden of showing the absence of a genuine issue concerning any material fact. *Adickes v. S.H.*

*Kress & Co.*, 398 U.S. 144, 159, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970). If the moving party meets its initial burden, the burden then shifts to the nonmoving party to "establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. at 322, 106 S.Ct. at 2552. To discharge this burden, the nonmoving party cannot rely on its pleadings, but instead must offer evidence showing that there is a genuine issue for trial. *Id.* at 324, 106 S.Ct. at 2553. Based on this standard the Court denies Plaintiffs' motion for summary judgment and partially grants the Defendant's motion.

The Plaintiffs are 905 former replacement workers of Defendant Ravenswood Aluminum Corporation ("RAC"). These workers were dismissed following a strike settlement requiring RAC to rehire union employees ("Steelworkers").

On November 1, 1990, union employees of Ravenswood Aluminum initiated a strike, and the company began hiring temporary replacement workers to fill open positions. Pursuant to orientation meetings held December 2 and 3, 1990, RAC informed these workers they were being made permanent replacements. The company continued hiring permanent replacements until the strike ended on June 29, 1992.[1]

At the conclusion of orientation meetings, each permanent employee signed an agreement stating the following (hereinafter the "Belknap Agreement"[2]):

"I hereby acknowledge that Ravenswood Aluminum Corporation made me a permanent employee effective immediately [date]. I understand that my permanent employee status is subject to a settlement with the union, a settlement with the National Labor Relations Board, or an Order of the National Labor Relations Board directing that Ravenswood Aluminum Corporation reinstate strikers."

All permanent replacements executed an employment application stating the following:

"I affirm that no oral representation has been made to me regarding the length of employment with Ravenswood Aluminum Corporation and that I understand that employment is not for a definite period of time and may be terminated with or without cause at any time."

Concurrent with, and subsequent to their respective orientation meetings, the permanent replacements claim RAC management made various written and oral promises of job security. For purposes of summary judgment, RAC concedes that employees were advised the company was committed to keeping replacement workers, that it intended to do everything in its financial and legal power to keep replacement workers, that the company did not intend to agree with the Steelworkers that the replacements would lose their jobs, that RAC believed it would win its case before the National Labor Relations Board ("NLRB"), so that replacements need not worry about an NLRB order requiring reinstatement of strikers, that if RAC lost its NLRB case the company intended to exhaust up to five years of appeal through the United States Supreme Court before any replacement worker lost his job, and that replacement workers should consider themselves permanent employees whose employment would terminate only if they quit, retired, or were fired for cause for violating company rules.[3] The Court also notes letters from company management, press releases, articles from RAC's "Aluminator" newsletter, and deposition statements.[4]

---

1. Permanent replacements hired subsequent to December, 1990 were also required to attend orientation sessions.

2. The term "Belknap Agreement" derives from the Supreme Court decision in *Belknap, Inc. v. Hale*, 463 U.S. 491, 103 S.Ct. 3172, 77 L.Ed.2d 798 (1983).

3. See page 34 of the Defendant's summary judgment motion.

4. The Court notes the following communications from RAC management to employees:

—R. Emmett Boyle (former Chairman and CEO of RAC):
"The Corporation is *firmly committed* to its permanent replacement workers and has no intention of jeopardizing your position with us. *We are not 'selling you out.'* "
—Don Worlledge (former RAC President):

On May 27, 1992, RAC reached tentative settlement agreements with the union and the National Labor Relations Board ("NLRB"). These agreements specifically required the return of all striking Steelworkers on June 29, 1992, and the dismissal of permanent replacement workers to allow for returning strikers.[5] On May 29, 1992, Don Mancini, Director of Human Resources for RAC, notified permanent employees of the tentative settlement:

> "RAC has submitted a final proposal to the Steelworkers which will be voted on in the next few weeks. If that proposal is accepted, it is likely that you will be separated from RAC to make room for returning Steelworkers.
>
> In the event a separation of replacement workers does become necessary, a severance package will be provided to current employees who remain at work up to the day of their separation. That package will include the following:
>
> 1.  One (1) month's pay;
>
> 2.  Payment of accumulated vacation;

" 'When this labor dispute began, we had no intention of permanently replacing the hourly work force.

. . .

" 'The union's insistence on unreasonable economic demands forced us to take the emotionally difficult step of replacing the work force with new employees. Our permanent replacement workers are good people, most of whom are West Virginians, and they are loyal employees. We, in turn, will be loyal to them.' "

"We consistently have stated we intend to keep our permanent replacement workers, and we have and we will continue to use all legal means available to do just that. The dedication and enthusiasm of the permanent replacement workers is very important to us, and the management of RAC believes we owe you our loyalty in return."

"The union's latest offer was unacceptable to us, and the union termed our proposals equally unacceptable.

We rejected one union proposal in particular— that all permanent replacement workers .be discharged.

I want to assure you that we intend to stand by you and to thank you for the energy, enthusiasm and dedication that has marked your first few months on the job."

—Debra Boger (Vice President of Administrative Services for RAC):

3.  A continuation of the Company's contribution to medical insurance for three months for all employees who select coverage; and

4.  Placement on a preferential hiring list, which will be considered when filling future job vacancies."

On June 16, 1993, RAC sent the following letter to employees:

> "In case there is doubt, RAC's position was and is as follows:
>
> Replacement workers who remain at work until they are released will be placed on a preferential hiring list. When and if vacancies occur, whether immediately or in the future, it is RAC's intent that they will be filled by qualified workers from that list before RAC considers other applicants."

Lastly, on June 23, 1992, Don Mancini sent a letter to permanent replacements conditioning the receipt of preferential hiring and medical coverage for August and September, 1992 on the replacements' willingness to execute a release of claims against RAC. A total of 721 replacement workers ultimately signed releases promising not to sue RAC.[6]

"Understanding that we do have 725 permanent replacement workers in here ... It's our intention that they will remain here ... And if we get an agreement with the Steelworkers, then we would negotiate with them who would fill the remaining jobs."

—Lastly, the Court notes the following exchange from Emmett Boyle's deposition:

"Q And I take it then ... Ravenswood made a conscious effort to reassure the employees or the replacement workers of the position that any negotiated settlement [with the union] was going to be for the remaining jobs?

A Generally, that was true."

5.  The NLRB settlement specifically required that RAC agree to and post the following notices to all employees:
"We [RAC] will offer all employees on our payroll as of October 31, 1990, whom we allegedly locked out, full and immediate reinstatement ... discharging, if necessary, employees hired from other sources to make room for them."

6.  These releases provided as follows:
"Because Ravenswood Aluminum Corporation ("RAC") is providing me with medical insurance coverage for August and September 1992 and placing me on a preferential hire list for future job openings at Ravenswood Aluminum Corporation, I hereby agree not to sue them or make any claims against them for anything

Pursuant to settlement agreements between RAC, the union, and the NLRB, permanent replacements were terminated on June 29, 1992.

Count one of the complaint asserts Plaintiffs were wrongfully discharged, in breach of an implied and express employment contract under which Plaintiffs were promised they would not be discharged or replaced by returning union workers. Count two claims RAC failed to fully compensate the Plaintiffs for earned fringe benefits and severance benefits, in violation of the West Virginia Wage Payment and Collection Act. W.Va.Code § 21–5–1 et seq.. Count three alleges the Defendant failed to provide plaintiffs with sixty (60) days written notice of their termination, in violation of the Worker Adjustment and Retraining Notification Act ("WARN Act"). 29 U.S.C. § 2104(a)(5). Count four has already been dismissed pursuant to agreed stipulation. Lastly, count five asserts that RAC breached an implied covenant of good faith and fair dealing between the Plaintiffs and the company.

## EMPLOYEE RETIREMENT INCOME SECURITY ACT

The first issue concerns severance benefits offered in the May 29 and June 23, 1992 letters. The Court notes "that plans established by an employer to provide severance benefits are employee welfare benefit plans within the meaning of [the Employee Retirement Income Security Act ("ERISA")]." *Biggers v. Wittek Industries, Inc.*, 4 F.3d 291, 297 (4th Cir.1993); *Holland v. Burlington Industries, Inc.*, 772 F.2d 1140, 1145–46 (4th Cir.1985). As a general rule, an employee welfare benefit plan includes plans which provide benefits in the event of unemployment. 29 U.S.C. § 1002(1)(A).

■ Based on *Biggers* and *Holland*, the May 29 and June 23 letters constitute employee welfare benefit plans under ERISA. One month's severance pay, extended medical coverage, and preferential hiring constitute severance benefits provided in the event of unemployment, and therefore meet ERISA's broad definition of a welfare benefit plan.

■ Under ERISA statute, state law is preempted to the extent it relates to any employee benefit plan. 29 U.S.C. § 1144(a). State law "relates to" an employee benefit plan "if it has a connection with or reference to such a plan." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96–97, 103 S.Ct. 2890, 2900, 77 L.Ed.2d 490 (1983). ERISA preemption must be given broad effect because of what the Court of Appeals of this Circuit has characterized as "the unparalleled breadth of ERISA's preemption provision." *Holland v. Burlington Industries, Inc.*, 772 F.2d at 1147.[7] Thus ERISA preempts state actions for breach of contract, when the alleged breach relates to the payment of benefits under a severance plan. *Biggers v. Wittek Industries, Inc.*, 4 F.3d at 297–98; *Holland v. Burlington Industries, Inc.*, 772 F.2d at 1147.

### THE RELEASES

■ Applying ERISA principles, the Court must first resolve the validity of releases signed by 721 of the replacement workers. The Plaintiffs assert these releases are invalid due to lack of consideration. Specifically, Plaintiffs claim the May 29, 1992 letter from RAC unconditionally promised

---

relating to my employment or the termination of my employment by them. I realize that, by accepting these things, I can not bring a lawsuit or action against Ravenswood Aluminum Corporation. I also realize that I will receive one month's severance pay and health benefits for July 1992 whether or not I sign this release."

7. The Court notes its statutory obligation to apply ERISA law:
"[E]mployees may, as here, urge that a particular policy is *not* within ERISA so that claims may be heard before state courts or questions of federal preemption of state statutes may be avoided. These desires, however understandable, do not give us license to avoid the scheme established by Congress.

. . .

The fact that employees may sometimes wish to forego ... ERISA coverage in favor of arguably more generous state statutes does not allow us to escape the clear direction of Congress." *Holland v. Burlington Industries, Inc.*, 772 F.2d at 1146.

workers preferential hiring and extended medical coverage, while the June 23 letter offered these same benefits in exchange for a signed release.

■ Under traditional contract principles the Plaintiffs' argument may be valid. As a general rule, a valid and enforceable release must be based on valuable consideration. *Doganieri v. United States,* 520 F.Supp. 1093, 1095 (N.D.W.Va.1981). " 'The doing by one of that which he is already legally bound to do is not a valuable consideration for a promise made to him, since it gives to the promisor nothing more than that to which the latter is already entitled.' " *O'Farrell v. Virginia Public Service Co.,* 115 W.Va. 502, 177 S.E. 304, 306 (1934) (quoting *Thomas v. Mott,* 74 W.Va. 493, 82 S.E. 325, 326 (1914)). A promise to perform a preexisting duty is not sufficient consideration for a new contract. *Employer–Teamsters, Etc. v. Weatherall Concrete,* 468 F.Supp. 1167, 1170 (1979).

■ The provisions of ERISA, however, preempt state contract law that relates to or has a connection with an employee benefit plan, including severance plans. The Court particularly notes the decision in *O'Shea v. Commercial Credit Corp.,* 930 F.2d 358 (4th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 177, 116 L.Ed.2d 139 (1991). In *O'Shea* the Plaintiff's job was terminated, and her employer offered severance benefits in exchange for a release of claims under the Age Discrimination in Employment Act ("ADEA"). The Plaintiff ultimately signed the release, partially in exchange for 27 weeks severance pay. Despite issues of preexisting contract consideration, the Court upheld the validity of the release:

> "The appellant contends that the $23,-371.20 in severance pay which she received was an entitlement which had already accrued to her and, accordingly, it could not be deemed consideration given for the release. Relying on basic contract principles, she contends that her continued work for the company was done with the expectation that she might eventually receive the severance pay.
>
> In *Holland v. Burlington Industries* ... however, this court held that severance

pay arrangements, whether funded from general assets or from a special trust, were governed by ERISA. Accordingly, the court in *Sejman v. Warner–Lambert Co., Inc.,* 889 F.2d 1346, 1348–49 (4th Cir.1989) ... reasoned that '[b]ecause, under ERISA, severance benefits are contingent and unaccrued, an employer may unilaterally amend or eliminate the provisions of a severance plan....'

To the extent, then, that contract principles are implicated, they are entirely preempted by ERISA ...

In sum, O'Shea received approximately $23,000 ... and a "bridging" arrangement, which saved her some pension losses, *in consideration for her agreement to waive any ADEA claims....*" *Id.* at 362 n. 3 (emphasis added).

The Courts also notes the following language from the *Sejman* decision:

> " '[T]he accrued benefits secured by ERISA do not encompass unfunded, contingent early retirement benefits or severance payments. The Act was not designed to prohibit modifications of these ancillary benefits.' " *Sejman v. Warner–Lambert,* 889 F.2d at 1348.

■ Based on the *O'Shea* decision, ERISA preempts state contract law with respect to a release obtained in exchange for severance benefits. Applying the *Sejman* decision, an employer may unilaterally terminate or amend an ERISA severance plan, because severance benefits are contingent and unaccrued. The *O'Shea* court allowed the Defendant employer unilaterally to condition severance benefits upon execution of a release, irrespective of whether those benefits constituted consideration under state contract law. The appellate court essentially dismissed Plaintiff's argument that she had a preexisting right to "accrued" severance pay.

■ Applying the *O'Shea* ruling, the Court concludes the June 23 releases were supported by consideration in the form of an ERISA severance plan, regardless of whether the same severance benefits "accrued" pursuant to the May 29 letter. State contract law regarding preexisting consideration

is preempted by the employer's unilateral right to amend or eliminate a severance plan under ERISA. Accordingly the Court grants summary judgment with respect to all claims filed by the 721 workers who signed releases.[8]

The next issue concerns pending counts raised by the 184 remaining plaintiffs.

### COUNT ONE

The Defendant claims count one should be dismissed based on the at will nature of Plaintiffs' employment, the Belknap Agreements, and the Statute of Frauds. The Defendant also seeks dismissal of the count one claim for punitive damages, emotional distress damages, and damages arising from Plaintiffs' expenses in seeking other employment.[9] The Plaintiffs oppose dismissal based on Defendant's oral and written representations regarding job security. The Plaintiffs also oppose dismissal of any damages claim. For reasons discussed below, the Court denies summary judgment on count one, with the exception of the claim for punitive damages.

### A. AT–WILL EMPLOYMENT AND THE BELKNAP AGREEMENTS

In West Virginia the law presumes employment is terminable at will. *Suter v. Harsco Corp.*, 184 W.Va. 734, 403 S.E.2d 751, 754 (1991). Thus " '[w]hen a contract of employment is of indefinite duration it may be terminated at any time by either party to the contract.' " *Id.* at 737, 403 S.E.2d at 754 (citation omitted). "The burden is on the party contending that the relationship was other than terminable at will to rebut the presumption of employment terminable at will." *Id.* at 737, 403 S.E.2d at 754.

Any promises alleged to alter the presumption of at will employment "must be *very definite* to be enforceable." *Id.* at 737, 403 S.E.2d at 754. In addition, "where an employee seeks to establish a permanent employment contract or other substantial employment right, either through express promises by the employer or by implication from the employer's personnel manual, policies, or custom and practice, such claim must be established *by clear and convincing evidence.*" *Adkins v. Inco Alloys Intern., Inc.*, 187 W.Va. 219, 225, 417 S.E.2d 910, 916 (1992) (emphasis added).

Despite this high standard, the "at will" presumption is not unqualified, and "contractual provisions relating to discharge or job security may alter the at will status of a particular employee." *Cook v. Heck's Inc.*, 176 W.Va. 368, 372, 342 S.E.2d 453, 457 (1986). An employee's willingness to continue work in exchange for greater job security may constitute valuable consideration for modification of an employment contract: "We agree with those courts that have found valuable consideration in the continued labor of workers who have in the past forgone their right to quit at any time." *Id.* at 374, 342 S.E.2d at 459.

Applying these standards to the pending action, the Court concludes there are genuine issues of material fact regarding explicit promises of job security made by RAC. The Court notes that RAC does not dispute, for purposes of summary judgment, that employees were told the company did not intend to agree with Steelworkers that replacements would lose their jobs, and that replacements would only be terminated if they quit, retired, or were fired for cause for violating company rules. The Court also notes the various statements contained in RAC's communications with employees.[10]

Accordingly the Court concludes that explicit promises of job security may have altered the terms of Plaintiffs' at will employment contract, as well as the terms of the Belknap Agreement. Such modifications

---

**8.** The Court notes Plaintiffs make no attempt to invalidate the releases on grounds other than insufficient consideration. Plaintiffs, for example, do not claim the releases were fraudulently obtained, or were involuntarily or unknowingly signed. The Court concludes Plaintiffs are bound by the release terms.

**9.** The Court declines to address the argument that job search expenses should be dismissed. RAC has failed to establish a right to judgment as a matter of law on this issue.

**10.** See footnote four.

were supported by consideration in the form of replacements' continued willingness to work, thereby foregoing their "right to quit at any time." The Court notes, however, that Plaintiffs must prove alleged promises of "substantial employment rights" by clear and convincing evidence, and any such promises must be "very definite" to be enforceable.

## B. STATUTE OF FRAUDS

The Court rejects Defendant's claim that count one should be dismissed based on the statute of frauds. "[I]f an oral contract may, in any possible event, be fully performed according to its terms within a year, it is not within [the statute of frauds] ... and it is only necessary that the contract be capable, by reasonable construction, of full performance by one side within a year in order to remove it from the statute of frauds." *Thompson v. Stuckey*, 171 W.Va. 483, 485–486, 300 S.E.2d 295, 298 (1983). In the pending action RAC could have entered a settlement with Steelworkers within one year of RAC's alleged promises of job security, and that settlement could have provided that replacement workers keep their jobs. Under this scenario, RAC would have fully performed its alleged contractual commitment to replacements within a year. Thus the agreements do not fall within the bar of the statute of frauds.

## C. COUNT ONE DAMAGES

The next issue concerns the damages requested in count one. The Court dismisses the claim for punitive damages, since such relief is generally not recoverable in an action for breach of contract. *Horn v. Bowen*, 136 W.Va. 465, 469, 67 S.E.2d 737, 739 (1951); *C.W. Development v. Structures, Inc.*, 185 W.Va. 462, 466, 408 S.E.2d 41, 45 (1991); *Mace v. Charleston Area Medical Center*, 422 S.E.2d 624, 634 (W.Va.1992).

With respect to emotional distress damages, the Court notes the decision in *Allen v. Smith*, 179 W.Va. 360, 368 S.E.2d 924 (1988). In *Allen* the court refused to permit breach of contract damages for emotional distress, where the only alleged loss consisted of embarrassment and humiliation:

"Except in extraordinary circumstances, such as a breach of a promise to marry, compensatory damages for emotional distress *without an accompanying physical or economic loss* cannot be awarded in a contract action." *Id.* at 363, 368 S.E.2d at 927 (emphasis added).

Unlike the *Allen* case, the Plaintiffs' count one claim alleges economic loss in the form of lost income and benefits, impaired earning capacity, and expenses in seeking new employment. Thus this count asserts damages for emotional distress accompanied by economic loss. The Court therefore declines to dismiss the action for emotional distress damages.[11]

## COUNT TWO

The next issue involves the count two claim that RAC failed to fully compensate the Plaintiffs for earned fringe benefits and severance benefits promised in the May 29, 1992 letter, in violation of the West Virginia Wage Payment and Collection Act ("Wage Act"). W.Va.Code § 21–5–1 et seq. The Defendant seeks dismissal on various grounds, while the Plaintiffs' seek summary judgment with respect to their right to accrued vacation benefits.[12] For reasons that follow, the Court concludes dismissal is appropriate.

## A. SEVERANCE BENEFITS

As discussed above, ERISA preempts state law which "relates to" or "has a connection with" an employee welfare benefit plan, including severance plans. ERISA preempts state actions to recover severance

---

11. The Court notes that in order to recover damages for emotional distress, Plaintiffs still must prove RAC committed an intentional wrong in allegedly breaching an employment contract:

"[T]he right to recover emotional distress in the absence of some physical injury or a subsequently developed physical injury is ordinarily predicated on some intentional wrong of the

defendant. We have cases where emotional distress recovery has been permitted where the underlying cause of action involved an intentional tort." *Allen v. Smith*, 179 W.Va. 360, 363, 368 S.E.2d 924, 927 (1988).

12. This is the only area addressed by Plaintiffs' motion for partial summary judgment.

benefits under the West Virginia Wage Payment and Collection Act. *Southern v. Emery Worldwide,* 788 F.Supp. 894, 896 (S.D.W.Va.1992). The Court notes that ERISA does not preempt a state wage action for accrued vacation; such benefits are generally considered a part of regular compensation, rather than severance pay under ERISA. *Massachusetts v. Morash,* 490 U.S. 107, 119–120, 109 S.Ct. 1668, 1675–76, 104 L.Ed.2d 98 (1989).[13]

██ Based on these principles, the Court concludes ERISA preempts the count two action for severance benefits in the form of one month's severance pay, extended medical coverage, and preferential hiring. Applying the ERISA principles stated in *Sejman,* RAC had unilateral authority to terminate these benefits if employees did not sign a release. Thus employees who refused to sign such a document are not entitled to severance benefits a release would have provided them with: specifically, extended medical payments for August and September of 1992 and preferential hiring. The Court dismisses count two to the extent it seeks recovery of these benefits. Because there is no genuine dispute over whether all 905 Plaintiffs received one month's severance pay and medical coverage for July, 1992, the Court also dismisses any count two claim for these severance benefits.[14]

### B. FRINGE BENEFITS AND ACCRUED VACATION PAY

██ With respect to fringe benefits, ERISA preemption is inapplicable and the West Virginia Wage Payment and Collection Act still applies. The fringe benefits involved in this action include performance sharing, profit sharing, and accrued vacation pay. Each of these benefits is governed by its own respective company plan: RAC's performance sharing plan provides quarterly bonuses if production requirements are met, and if employees meet the following eligibility requirements:

"1) Must have been a *full-time employee* in an incumbent position on the Ravenswood Aluminum Corporation active payroll the *entire quarter* for which payouts are being made.

2) Must be employed *full time* by Ravenswood Aluminum Corporation and actively on the payroll *at time of payout.*"

RAC's profit sharing plan conditions eligibility upon active employment with the company.[15] Lastly, RAC's employee handbook provides that employees with less than one year's service and more than 1000 hours worked are eligible for one week of vacation pay. Employees working as of December 31 of any year, with more than 1400 hours worked in the preceding twelve month period, are eligible for two to four weeks of vacation pay.

It is undisputed that eligible Plaintiffs received the fringe benefits provided by these company plans.[16] Plaintiffs, however, seek additional "earned" benefits despite ineligibility for such benefits under plan terms.

Section 21–5–3 of the West Virginia Wage Payment and Collection Act provides as follows:

"Every person, firm or corporation doing business in this State ... shall settle with its employees at least once in every two weeks, unless otherwise provided by special agreement, and pay them the wages due ... for their work or services in lawful money of the United States...."

Section 21–5–1(c) of the Wage Act defines "wages" as follows:

"The term 'wages' means compensation for labor or services rendered by an employee, whether the amount is determined on a time, task, piece, commission or other basis of calculation.

. . .

---

13. Accrued vacation pay constitutes a fringe benefit rather than a severance benefit, and is discussed below.

14. See pages 80 and 81 of RAC's summary judgment motion, and pages 36 through 38 of Plaintiffs' response to this motion.

15. See RAC's profit sharing plan, sections A.1 and C.1.

16. See pages 72 through 80 of RAC's summary judgment motion.

[T]he term 'wages' shall also include then accrued fringe benefits capable of calculation and payable directly to an employee: Provided, That *nothing herein contained shall require fringe benefits to be calculated contrary to any agreement between an employer and his employees which does not contradict the provisions of this article.*" (emphasis added).

Based on the italicized language above, the Court concludes Plaintiffs are only entitled to performance sharing and profit sharing payments calculated pursuant to RAC's benefit plans. Similarly, Plaintiffs are only entitled to accrued vacation pay calculated pursuant to RAC's employee handbook. Because the Plaintiffs have received the payments required by these benefit plans, the Court grants summary judgment on the count two claim for fringe benefits. The Court therefore dismisses count two in its entirety.

### COUNT THREE

The next issue concerns the count three claim that RAC failed to provide Plaintiffs with sixty (60) days written notice of their termination, in violation of the WARN Act. 29 U.S.C. § 2104(a)(5). The Plaintiffs seek 30 days lost wages and fringe benefits, plus attorney's fees.

With respect to count three, the Court denies the Defendant's motion for summary judgment. RAC has failed to establish a right to judgment as matter of law.[17]

### COUNT FIVE

Lastly, the Court must address the count five claim for breach of the implied covenant of good faith and fair dealing. In

*Shell v. Metropolitan Life Ins. Co.,* 183 W.Va. 407, 396 S.E.2d 174 (1990), the Supreme Court of Appeals of West Virginia stated the following:

"Although in *Harless* we noted that Massachusetts recognized 'an implied covenant of good faith and fair dealing,' we adopted only the substantial public policy exception for at will employees.

. . . .

Under *Harless* and its progeny, a substantial public policy violation is the only exception to the general rule that 'at will' private employment is terminable by either party, with or without cause." *Id.* at 414, 396 S.E.2d at 181 (citations omitted).

Both the Fourth Circuit and this Court have rejected an implied covenant of good faith and fair dealing for at will employees. *Speelman v. Smith's Transfer Corp.,* 790 F.2d 889 (4th Cir.1986) (unpublished opinion); *McKinney v. K–Mart Corp.,* 649 F.Supp. 1217, 1220 (S.D.W.Va.1986).

The Court notes that count five of the complaint fails to reference any statutory law which might constitute a "substantial public policy." See *Harless v. First National Bank,* 162 W.Va. 116, 124–125, 246 S.E.2d 270, 275–276. Absent such a policy, the *Shell* decision benefitting at will employees is inapplicable. The Court therefore concludes that even if Plaintiffs qualify as at will employees, there still is no action for breach of the implied covenant of good faith and fair dealing.

To the extent Plaintiffs benefit from an express employment contract, in the form of explicit promises of job security, then any implied covenant of good faith is precluded: "An implied contract and an express one covering the identical subject-matter cannot

---

17. The Court declines to address the Defendant's questionable arguments on an individual basis, with one exception. Specifically, RAC claims Plaintiffs' right to 30 days backpay should be offset by the one month's severance pay already received. RAC relies on the WARN Act provision allowing employers to offset liability for backpay by "any wages paid" during the period of the violation [29 U.S.C. § 2104(a)(2)(A)], and "any voluntary and unconditional payment by the employer to the employee that is not required by any legal obligation." [29 U.S.C. § 2104(a)(2)(B)].

The Court notes that severance pay under ERISA does not constitute wage compensation. See *Massachusetts v. Morash,* 490 U.S. at 117–120, 109 S.Ct. at 1674–1675; *Biggers v. Wittek Industries,* 4 F.3d 291 (4th Cir.1993). Therefore the wage offset enumerated by section 2104(a)(2)(A) is inapplicable. The Court also notes that RAC had a "legal obligation" to pay Plaintiffs one month's severance pay pursuant to the May 29 and June 23, 1992 letters. Therefore section 2104(a)(2)(B) is inapplicable.

exist at the same time." *Rosenbaum v. Price Construction Co.,* 117 W.Va. 160, 184 S.E. 261, 263 (1936). Counts one and five both involve the same subject matter: count one involves breach of express promises of job security, while count five asserts RAC acted in bad faith in breaching these express promises.[18] The Court therefore grants summary judgment on count five.

Accordingly the Court **GRANTS** summary judgment with respect to the 721 workers who signed releases. Regarding the 184 remaining Plaintiffs, the Court **DENIES** the Defendant's motion for summary judgment on counts one and three, with the exception of the count one claim for punitive damages, and **GRANTS** the Defendant's motion for summary judgment on counts two and five. Lastly, the Court **DENIES** Plaintiffs' motion for partial summary judgment. The Clerk is directed to send a copy of this Order to counsel of record.

---

**18.** The Court specifically notes paragraph 22 from count one, and paragraph 45 from count five. Paragraph 22 states the following:

"[P]laintiffs were wrongfully discharged/replaced in clear violation and breach of the implied and express contract of employment under the terms of which plaintiffs were expressly promised that they would not be discharged or replaced by returning union workers."

Paragraph 45 states as follows:

"Defendant Ravenswood's displacement of the plaintiffs by returning Steelworkers was in violation and breach of the implied covenant of good faith and fair dealing between Ravenswood and plaintiffs."