

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-30-1998

# Ciarlante v. Brown & Williamson

Precedential or Non-Precedential:

Docket 97-1152,97-1174,97-1725

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation

"Ciarlante v. Brown & Williamson" (1998). *1998 Decisions.* Paper 97.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/97

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed April 30, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 97-1152, 97-1174 and 97-1725

LOUIS A. CIARLANTE; THOMAS A. MARSHALL,
INDIVIDUALLY AND ON BEHALF OF A CLASS OF
INDIVIDUALS

       Appellants/Cross-Appellees
       in Appeal No. 97-1174

v.

BROWN & WILLIAMSON TOBACCO CORPORATION;
THE AMERICAN TOBACCO COMPANY;
AMERICAN BRANDS, INC.

       Brown & Williamson Tobacco Corporation and
       The American Tobacco Company,

       Appellants/Cross-Appellees
       in Appeal No. 97-1152 and 97-1725

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 95-cv-04646)

Argued Tuesday, November 4, 1997

BEFORE: BECKER, ROTH and GARTH, Circuit Judges

(Opinion filed April 30, 1998)

John M. Elliott, Esq.
Timothy H. Myers, Esq.
Frederick P. Santarelli, Esq. (Argued)
Elliott, Reihner, Siedzikowski &
 Egan
925 Harvest Drive
Union Meeting Corporate Center V
Blue Bell, PA 19422

Attorneys for Louis A. Ciarlante and
Thomas A. Marshall, Individually and
on behalf of a Class of Individuals

Barry Simon, Esq. (Argued)
Christopher J. Moran
Simon Higgins & Moran, P.C.
1650 Market Street
One Liberty Place
Philadelphia, PA 19103-7397

Attorney for Brown & Williamson
Tobacco Corporation; The American
Tobacco Company

OPINION OF THE COURT

GARTH, Circuit Judge:

This appeal requires us to decide whether the district court properly granted summary judgment to the plaintiff class against the defendants. The district court held as a matter of law that the defendants' Chester, Virginia administrative center was the plaintiffs' "single site of employment" under the Worker Adjustment and Retraining Notification Act, 29 U.S.C. S 2101(a)(3)(B), and therefore awarded damages and attorneys' fees to the plaintiffs. We hold that a genuine issue exists as to whether the Chester center was the plaintiffs' "single site of employment," so that the district court's grant of summary judgment was improper. We will reverse and remand.

I.

The plaintiffs in this action are a class of over one hundred former employees of the American Tobacco

2

Company ("the Company"), who worked throughout the United States as traveling salespeople. Officially titled Field Sales Representatives ("sales representatives"), the plaintiffs were each assigned to a geographical district in which they were responsible, along with other sales representatives, for selling the Company's products to wholesalers and retailers in that district. Altogether, the Company employed over one thousand sales representatives, located in 150 different districts covering the entire United States. Sales representatives were each provided a company car, and spent an overwhelming proportion of their time "on the road" visiting customers within their district.

The sales representatives communicated with other employees at the Company mostly by telephone. There were two primary contacts. First, each sales representative kept in close contact with a district sales manager, who, like the sales representatives, lived and worked in the designated district. Each district sales manager was responsible for managing the handful of sales representatives assigned within the district; like the sales representatives, most district sales managers worked from home, and had no other permanent office. The sales representatives' second significant contact was with the Company's administrative center in Chester, Virginia. Sales representatives called the Chester center every day to check messages, and also contacted the center regularly to order supplies.

The events that prompted this lawsuit occurred on January 11, 1995, soon after the defendant Brown & Williamson acquired the Company from American Brands, Inc. On that day, the Company summoned the sales representatives to "sales meetings" held across the country. At the "sales meetings," Company officials announced to the sales representatives that they were being laid off, effective immediately. The sales representatives were forced to hand over their keys, samples, and distribution lists to Company representatives before they were allowed to leave. The Company also encouraged the employees to sign release forms, which would entitle each employee to a week's pay and job counseling services in exchange for a waiver of rights to additional benefits.

3

The plaintiffs in this action are employees who did not sign the release form. They brought suit in the United States District Court for the Eastern District of Pennsylvania against Brown & Williamson, American Tobacco, and American Brands, Inc. (collectively,"B&W") alleging that B&W had violated the Worker Adjustment and Retraining Notification Act ("WARN"), 29 U.S.C. SS 2101-09, by failing to warn the plaintiffs of their impending layoffs.[1] Enacted in 1988, WARN requires that employers provide written notice to those employees who will be subject to a "mass layoff " sixty days before the layoff occurs. See 29 U.S.C. S 2102(a).[2] Congress defined a "mass layoff " as "a reduction in force which . . . results in an employment loss at the single site of employment during any 30-day period for . . . at least 50 employees." 29 U.S.C. S 2101(a)(3) (emphasis added). The Act entitles affected employees who are not notified of an impending "mass layoff" to damages from their former employer in an amount equal to back pay for each day of the violation, for up to sixty days. See 29 U.S.C. S 2104(a).

Following class certification, it became clear that the plaintiffs' recovery hinged on whether B&W's action was a "mass layoff." Specifically, the central question was whether the action had resulted in an employment loss of more than fifty employees at one "single site of employment" as required by 29 U.S.C. S 2101(a)(3)(B).[3] In an order dated

_____

1. American Brands, Inc. is no longer a party to this action, as all claims
against it were dismissed on December 19, 1995.

2. 29 U.S.C. S 2102(a) (West Supp. 1998) provides in relevant part:

> An employer shall not order a plant closing or mass layoff until
> the end of a 60-day period after the employer serves written notice
> of such an order--

> (1) to each representative of the affected employ ees as of the time
> of the notice or, if there is no such representative at that time, to
> each affected employee; and

> (2) to the State dislocated worker unit (designat ed or created under
> title III of the Job Training Partnership Act) and the chief elected
> official of the unit of local government within which such closing or
> layoff is to occur.

3. B&W did not dispute that they had failed to provide the plaintiffs with written notice of the impending layoffs. In fact, the record reveals that

4

September 23, 1996, the district court announced that it would treat pending discovery applications as cross-motions for summary judgment, focusing on the "single site" requirement. The parties responded with both evidence and legal argument attempting to show as a matter of law that the single site requirement had (or had not) been satisfied.

The sales representatives argued that they were entitled to judgment as a matter of law because the Chester, Virginia administrative center was their "single site of employment." The sales representatives offered statements by former employees suggesting that the Chester center was the primary contact point for sales representatives in the field. According to the statements, sales representatives received their instructions from and reported to the administrative center in Chester. App. 2208–10; App. 1936. Each sales representative was required to call Chester every day to check messages, which frequently included instructions from management left on the sales representative's voice mail. App. 1936–37. Sales

_____

B&W had gone to great lengths to keep the layoffs a secret. The only action by B&W that could be construed as any type of notification was the mailing of a letter to local government officials the day before the layoffs. The top of the letter reads, "NOTICE REQUIRED UNDER THE WORKER ADJUSTMENT AND RETRAINING NOTIFICATION ACT." The letter continues:

> This notice is to advise you that The American Tobacco Company ("American Tobacco") will undertake a layoff at its Administrative Service Center located at 13203 North Enon Church Road, Chester, Virginia, 23831.

> While the number of affected employees has not yet been determined, it is expected that the layoff will affect approximately 1550 employees at the Chester facility (inclusive of approximately 1200 Field Sales employees, located nationwide).

> American Tobacco will advise affected employees of the layoff commencing January 11, 1995. The date of separation may be immediately upon notification to the affected employee, or, in some cases, may be at a later date.

App. 1880.

5

representatives also communicated with the Chester center to obtain sales materials, supplies, and other items they needed to perform their job. App. 2178-79. The sales representatives argued that they were entitled to judgment because their affidavits proved that the Chester center was their "single site of employment."

B&W's affidavits and arguments pointed to a different conclusion. According to B&W, it was entitled to judgment as a matter of law because the sales representatives' "single site[s] of employment" were the geographical districts where they actually worked. B&W maintained that the districts were the true hubs of the sales representatives' activities, as the local district sales managers were the employees who directed, managed, and monitored the sales representatives. B&W relied on various sources for support. First, they offered the affidavit of Mr. Randy Groonwald, a district sales manager from Milwaukee, who stated that his sales representatives were assigned work from him, not from Chester, Virginia. Groonwald also reported that he was responsible for the day-to-day concerns of his sales representatives, including hiring, training, job performance reviews, and approval of expenses. App. 1017-18. Groonwald's statements were supported by B&W's internal documents, which showed that supervision of sales representatives was the major task of district sales managers. App. 1223. B&W also relied upon its official job description for the sales representative position, which indicated that the sales representatives' primary contact within the company was with their district sales managers. App. 1226.

In response to the sales representatives' position that Chester was their single site of employment, B&W maintained that the Chester center was simply an administrative hub through which certain mailings and messages authored outside of Chester were sent to the sales representatives. Sales representatives were hired, trained, and instructed within their district, B&W noted; they worked entirely within their district; and they reported to their district sales managers within their district. Sales representatives did not regularly visit the Chester, Virginia center. In fact, named plaintiff Thomas A. Marshall visited

6

the center only twice, on special trips to recognize his outstanding sales record, App. 2266, and named plaintiff Louis A. Ciarlante never visited Chester at all. App. 2376. Accordingly, B&W argued that the districts, rather than the Chester center, were the plaintiffs' "single site of employment." Because there were fewer than fifty employees within each geographic district, B&W claimed that its action could not constitute a "mass layoff" under 29 U.S.C. S 2101(a)(3), and that it was entitled to judgment as a matter of law.

In an order dated November 6, 1996, the district court concluded as a matter of law that the Chester center was the plaintiffs' single site of employment and entered summary judgment in their favor. The district court reasoned that the voluminous record in the case "establishes, without any genuine dispute, that all instructions, assignments, rules, and orders to the plaintiff salesmen emanated from the Chester, Virginia headquarters." As a result, the Chester center was the plaintiffs' single site of employment. The court recognized that the local district sales managers played a role in issuing assignments to and receiving reports from the sales representatives, but found that the role of the sales managers was not significant. "Any contrary view," the court explained, "would . . . undermine the purposes of the statute. I am confident that Congress did not contemplate permitting a company to lay off its entire sales force of hundreds of people without being chargeable with having achieved a `mass layoff.' "4

Having found B&W liable, the court next considered the damages owed to the sales representatives. The first issue was whether the full statutory damage award should be reduced by the amount of severance payments that B&W had made to the employees following the layoffs. B&W contended that the answer was "yes," because 29 U.S.C.

_____

4. The district court believed that its decision was bolstered by the letters
the Company had sent to local officials on January 10, 1995. See supra
note 3. The district court opined that the letters "make[ ] clear that the
defendants themselves had concluded, at the time, that the WARN Act
did apply to these lay-offs."

7

S 2104(a)(2) directed that damage awards be reduced by "any wages paid by the employer to the employee for the period of the violations . . . [and] any voluntary and unconditional payment by the employer to the employee that is not required by any legal obligation." 29 U.S.C. S 2104(a)(2). The district court disagreed, holding that the damage award should not be reduced because the severance pay awards were ERISA payments that B&W was legally obligated to pay.

Second, the court held that the statutory damage award of back pay from a sixty day period as directed by 29 U.S.C. S 2104(a)(1) was to be calculated based on the pay equivalent of sixty actual working days, rather than the amount that a salaried employee would earn in a sixty day time period. The court thereupon entered an order granting summary judgment for the sales representatives.

B&W responded by submitting a Motion to Alter or Amend Judgment and for Reconsideration and Clarification. Attached to this motion were additional sworn declarations by Company employees. One such employee, Kathi Reynolds, stated that when she was a sales representative from 1985 to 1989, she sometimes received instructions that were mailed through the Chester facility, but that in almost every case, the true source of her instructions was the Company's executive headquarters in either Stamford, Connecticut or Conyers, Georgia. App. 2462. According to B&W, this affidavit illustrated that the district court had misunderstood the plaintiffs' statements that the sales representatives had received instructions "from" Chester. B&W asked the district court to reconsider its decision, in light of the new affidavits and the district court's haste in granting summary judgment in favor of the sales representatives.

In a December 18, 1996 order, the district court found this argument "disingenuous," and concluded that B&W was not entitled to have the court consider the additional materials. Citing "an abundance of caution," the court nevertheless looked at the new documents, and concluded that B&W had presented no triable issues of fact, as the motion for reconsideration and new documents "merely revisit[ed] arguments previously made and rejected."

8

The court did revise its conclusion concerning damages, however. The court held that it had misconstrued the scope of United Steelworkers of America v. North Star Steel Co.,5 F.3d 39 (3d Cir. 1993), and that the North Star case left open the question of how to calculate back pay damages according to 29 U.S.C. S 2104(a)(1) in the case of salaried employees. The district court concluded that the proper award of back pay damages for a 60 day period in the case of a salaried employee was simply two months's salary.

On January 28, 1997, the district court entered an order calculating a damage award for each of the sales representatives in the class of plaintiffs. The total value of the judgment was $696,785.44, plus interest from the date of the termination. On September 2, 1997, the court awarded attorney's fees to the plaintiffs pursuant to S 29 U.S.C. S 2104(a)(6) in the amount of $334,466.30 in fees and $26,855.83 in expenses.

II.

Summary judgment is appropriate when there are no genuine disputes as to any material facts. See Fed. R. Civ. P. 56(c). In such a case, a trial is unnecessary because a reasonable fact finder could not enter a judgment for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). Accordingly, we exercise plenary review, construing all evidence and resolving all doubts raised by affidavits, depositions, answers to interrogatories, and admissions on file in favor of the non-moving party. See SEC v. Hughes Capital Corp., 124 F.3d 449, 452 (3d Cir. 1997). Our task is to lay out the substantive law governing the action, and then in light of that law determine whether there is a genuine dispute over dispositive facts. See Liberty Lobby, 477 U.S. at 248, 106 S. Ct. at 2510.

III.

The issue in this case is whether the district court was correct as a matter of law that the Chester, Virginia administrative center was the plaintiffs' "single site of

9

employment" according to 29 U.S.C. S 2101(a)(3).5 The WARN act does not define the phrase "single site of employment." Congress did, however, expressly delegate to the Department of Labor the authority to promulgate regulations interpreting WARN. See 29 U.S.C.S 2107. These regulations must be given "controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." Chevron, U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S. 837, 843–44, 104 S. Ct. 2778, 2782 (1984).

The regulation applicable to this case appears at 20 C.F.R. S 639.3(i)(6). It states:

> For workers whose primary duties require travel from point to point, who are outstationed, or whose primary duties involve work outside any of the employer's regular employment sites (e.g., railroad workers, bus drivers, salespersons), the single site of employment to which they are assigned as their home base, from which their work is assigned, or to which they report will be the single site in which they are covered for WARN purposes.

20 C.F.R. S 639.3(i)(6) (1989).

This regulation narrows the inquiry considerably: we need only consider whether the Chester, Virginia administrative center was the site of employment to which the sales representatives were assigned as their home base; whether the Chester center was the site from which the

_____

5. 29 U.S.C. S 2101(a)(3) (West Supp. 1998) states:

> [T]he term "mass layoff" means a reduction in force which--
>
> (A) is not the result of a plant closing; and
>
> (B) results in an employment loss at the single si te of employment during any 30-day period for--
>
> (i)(I) at least 33 percent of the employees (exclu ding any part-time
> employees); and
>
> (II) at least 50 employees (excluding any part-tim e employees); or
>
> (ii) at least 500 employees (excluding any part-time employees)[.]

10

sales representatives' work was assigned; and whether the Chester center was the site to which they reported. If any one of these three inquiries can be answered in the affirmative, then the Chester center is a covered "single site of employment." See Teamsters Local Union 413 v. Driver's, Inc., 101 F.3d 1107, 1110 (6th Cir. 1996) ("This subpart is written in the disjunctive: any one of the alternatives may qualify as the definition of `single site.' "). Because at least fifty employees lost their jobs following the January 11, 1995 "sales meetings," a determination that Chester is a covered site under WARN as a matter of law would lead us to affirm the district court's entry of summary judgment in favor of the plaintiffs. See 29 U.S.C. S 2101(a)(3)(B)(i).

However, if we conclude as a matter of law that Chester, Virginia was not the site of employment to which the sales representatives were assigned as their home base, nor the site from which their work was assigned, nor the site to which they reported, then the Chester center is not a covered WARN site. Because the plaintiffs have not indicated the existence of any other covered sites at which fifty or more employees lost their jobs on January 11, 1995, the conclusion that Chester is not a covered site would lead us to reverse the order of the district court and enter summary judgment for B&W.

Finally, if a genuine issue of material fact exists as to whether the Chester center is a covered site for WARN purposes, then we must reverse the district court's order and remand.

A.

First we consider whether the Chester, Virginia administrative center is "the single site of employment to which [the sales representatives] are assigned as their home base." 20 C.F.R. S 639.3(i)(6). The underlying facts here are undisputed. Sales representatives spent the great majority of their time servicing customers within their geographical district. They mostly worked out of their cars, and were in frequent contact with their district sales managers, who lived within their respective districts and also worked from their own homes and cars. Sales representatives did not

11

physically visit Chester, Virginia in the normal course of business; however, they did telephone the Chester site on a daily basis to check messages and complete administrative tasks.

Whether Chester, Virginia was the sales representatives' "home base" depends on our legal construction of the term "home base" in the Secretary's regulation. B&W argues that an employee's assigned "home base" is the place from which the employee physically works on a regular basis. Under this interpretation, it is argued that the Chester center cannot be the sales representatives' home base. In contrast, the sales representatives focus less on the employee's whereabouts than on the physical location of the employer's major contacts with its employees. Accordingly, they maintain that an employee's "home base" must be a fixed physical building or structure of some kind owned by the employer. Because both the sales representatives and district sales managers worked from their homes and cars, the sales representatives contend that the Chester center must by default be considered the employees' "home base."

We agree with B&W that a traveling employee's "home base" must at a minimum be a location at which the employee is physically present at some point during a typical business trip. This follows from the text of 20 C.F.R. S 639.3(i)(6), which contrasts "the employer's regular employment sites" with the site of employment "to which [the employees] are assigned as their home base." We think that this language cannot be squared with the sales representatives's interpretation of "home base," as it effectively equates "home base" with a "regular employment site." In the context of 20 C.F.R. S 639.3(i)(6), we think that the term "home base" refers not to the physical base of the employer's operations, as the sales representatives would have it, but rather to the physical base of the employee.

Our construction is consistent with both Teamsters Local Union 413 v. Driver's, Inc., 101 F.3d 1107, 1110 (6th Cir. 1996) and Wiltz v. M/G Transport Services, Inc., 128 F.3d 957, 961–62 (6th Cir. 1997). The plaintiffs in Driver's, Inc. were eighty-five truck drivers who had been discharged without warning. Although their former employer's

12

management functions were located in Delaware, Ohio, the drivers had each been permanently assigned to one of eleven different base terminals in six different states. The maximum number of employees who were assigned to any one base terminal was eighteen, such that the plaintiffs' right to recover hinged upon whether the drivers' "single site of employment" was the one base terminal to which they were each assigned, or rather the amalgamation of all eleven terminals. Addressing the question of which site was the truckers' "home base," the Sixth Circuit concluded that each base terminal provided the plaintiffs' home base because it was the physical location where "[e]ach trucker starts and ends his or her workweek." Id. at 1110.

In Wiltz, the plaintiffs were former crewmen for a towboat operator based in Paducah, Kentucky. See Wiltz, 128 F.3d at 959. Typically, the crewmen would report to Paducah for assignment to the boats, and then embark on a thirty day voyage escorting barges throughout the Ohio, Mississippi, and Tennessee River Systems, returning in the end to Paducah. Following layoffs that prompted a WARN lawsuit, the Wiltz court noted (albeit in dicta) that Paducah was the crewmen's home base because "80% of the crews physically reported to Paducah for assignment to the towboats." Id. at 962.

In both Driver's, Inc. and Wiltz, the employees' home bases were the sites where they began and ended their business trips. Accordingly, these cases are consistent with our view that a traveling employee's "home base" must be a site that the employee visits during the course of a typical business trip.

Reviewing the record, there is no evidence that any of the plaintiffs regularly visited the Chester, Virginia administrative center in the ordinary course of their business trips. We know that named plaintiff Thomas A. Marshall visited the center only twice, on special trips to recognize his outstanding sales record, App. 2266, and that named plaintiff Louis A. Ciarlante never visited Chester at all. App. 2376. From the record as it now stands, we would be inclined to hold as a matter of law that Chester is not the sales representatives' "home base." However, because we are remanding this case to the district court for further

13

factual development, we will not foreclose the factfinder below from examining whether the sales representatives can prove that some of their number did in fact use the Chester center as their "home base" under the legal standard we have enunciated.

B.

We next consider whether the Chester, Virginia administrative center was the site "from which [the sales representatives'] work [was] assigned." 20 C.F.R. S 639.3(i)(6). Our concern here is with the source of the "day-to-day" instructions received by the sales representatives, notwithstanding "centralized payroll and certain other centralized managerial or personnel functions." Driver's, Inc., 101 F.3d at 1111 (citing International Union, United Mine Workers v. Jim Walter Resources, Inc., 6 F.3d 722, 724-26 (11th Cir. 1993)). Given the unusual working arrangements that 20 C.F.R. S 639.3(i)(6) covers, this legal standard may require a developed factual record in order to distinguish the true source of the instructions from mere conduits through which the instructions passed. We look to the record to determine whether a genuine issue of material fact exists as to whether the Chester, Virginia center was the source of the day-to-day instructions for the sales representatives.6

The statements offered by the sales representatives indicate that Chester was the origin of day-to-day instructions. Thomas J. Ogorek, who served as a district sales manager from August 1993 until January 1995, declared that "sales representatives . . . generally received instructions and assignments on what to sell our customers in letters and memos . . . . [sent] by mail from

_____

6. Although the district court appears to have considered the documents submitted along with B&W's motion for reconsideration, we will respect the district court's explicit finding that B&W was not entitled to such review. Accordingly, we will limit review to the record as it existed at the time of the district court's consideration of the cross-motions for summary judgment. See DeLong v. Raymond Int'l, Inc., 622 F.2d 1135, 1140 (3d Cir. 1980). On remand, however, the district court will be able to include these additional documents as part of the record.

14

our Chester Office." App. 1936. Similarly, the plaintiffs offer the declaration of Marc Lowery, who worked at the Chester center from 1986 until 1995. Lowery reported that "[t]he Chester office supplied the [daily instruction] information, and was the engine for the field's activity. We supplied what to do, where to do it, and the materials for doing it." App. 2217. Lowery reported that it was his responsibility

> to coordinate and issue, out of the Chester Office, all releases, bulletins and instructions to the field sales organization, including the field sales representatives and the district sales managers. These included the day-to-day instructions, assignments and procedures to be followed by the field sales representatives and district sales managers.
>
>  . . . .
>
> It was through these letters and instructions coming from the Chester Office that field salespersons were told what specific products management wanted them to sell and promote and how they were to do it through specific promotional strategies that they must use.

App. 2209-10.

B&W responds with statements indicating that the Chester, Virginia site was not the source of day-to-day instructions. Central to this response is the statement of Randy Groonwald, a former district sales manager from Wisconsin, who reported that the sales representatives in his district "were assigned work . . . by me . . . [and] were not assigned work by anyone in Chester, Virginia." App. 1018. Groonwald also verified the accuracy of B&W's representation that instruction and development of sales representatives was a district sales manager's primary task, and also that it was part of the sales manager's job to manage sales productivity and allocate sales efforts. App. 1017-18; App. 1223. In addition, B&W relies on the deposition of named plaintiff Thomas A. Marshall, a former sales representative. Marshall was asked, "[d]id you ever take any orders from anyone at the administrative center down in Chester, Virginia?" His response: "No, I didn't." App. 2270.

15

These conflicting statements force us to conclude that there is a genuine issue of material fact concerning whether the Chester, Virginia center was the location from which work was assigned to the sales representatives. If we were to credit the statements of Ogorek and Lowery over those of Groonwald and Marshall, then we would conclude that Chester is the location from which work was assigned; if we were to credit Groonwald and Marshall over Ogorek and Lowery, then we would conclude that it was not. The summary judgment standard forbids us from making these judgments, however. See Liberty Lobby, 477 U.S. at 249 ("[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."). Accordingly, we hold that this is a material issue for trial.

C.

Finally, we consider whether there is an issue as to whether Chester was the site "to which [the sales representatives] report[ed]." 20 C.F.R. S 639.3(i)(6). This inquiry focuses on the location of the personnel who were primarily responsible for reviewing sales reports and other information sent by the sales representatives, in order to record sales, assess employee performance, develop new sales strategies, and the like.

Reviewing the record, we hold that there is a genuine issue of fact concerning whether the Chester center was the site to which the sales representatives reported. The plaintiffs have offered statements indicating that Chester was the primary audience for the sales representatives' reports. For example, Mark Lowery reported that "[t]he Chester office is where all reported information flowed and . . . where it all ended up." App. 2217. Similarly, Thomas Ogorek declared that "[f]ield sales representatives . . . reported all . . . employment-related information to the Chester office." App. 1936. Ogorek acknowledged that district sales managers such as himself sometimes played a role in the reporting process, but stated that his role was secondary: "I would facilitate the Chester office by collecting the information and forms from the . . . sales

16

representatives, and [by] then funneling them to the Chester office." Id.

In contrast, B&W has offered statements indicating that the sales representatives reported primarily to the district sales managers. Plaintiff Thomas A. Marshall indicated at his deposition that he submitted all summaries of his sales performance to his district sales manager, and that he regularly left messages for his district sales manager on the manager's voicemail. App. 2267–68. District sales manager Randy Groonwald reported that the sales representatives in his district "hand-delivered or mailed to me daily call summaries detailing their activities [every] week," and that they "did not report to anyone in Chester, Virginia." App. 1018. Groonwald also stated that the company's official job description for the sales representative position was accurate in its statement of the major contacts that sales representatives would have with other company employees. App. 1017. The description states that the major contact was "[f]requent contact with District Sales Manager to keep him/her informed of all developments," and does not mention contact with the Chester center. App. 1226.

These statements submitted by the sales representatives and B&W are in conflict. According to the former, the sales representatives reported to the Chester, Virginia administrative center; according to the latter, the sales representatives reported to their local district sales managers. Thus, there is a genuine issue of material fact as to whether the Chester site was the location to which the sales representatives reported, precluding resolution on summary judgment.7

_____

7. In his dissent, Chief Judge Becker takes issue with our determination that the present record presents genuine issues of material fact that preclude resolution on summary judgment. According to Chief Judge Becker, "th[e] evidence is not in conflict, but instead commands the conclusion that the Chester center was the ultimate site from which the plaintiffs' work was assigned and to which they reported." Dissenting Op. at 26.

As we see it, Chief Judge Becker's attempt to harmonize statements that on their face are in conflict is contrary to our duty to view inferences from the underlying facts in the light most favorable to the

17

IV.

In summary, we conclude that a genuine issue of material fact exists as to whether the Chester, Virginia administrative center was a "single site of employment" according to 20 C.F.R. S 639.3(i)(6) and 29 U.S.C. S 2101(a)(3)(B). We will therefore reverse the order of the district court granting the sales representatives' motion for summary judgment and denying B&W's motion for the same, and remand for proceedings consistent with the foregoing opinion.

On remand, the parties and the district court should focus attention on the precise questions of whether the Chester, Virginia center was the representatives' home base, the site from which the sales representatives' work was assigned, and the site to which they reported. The Company's own actions in characterizing its "notice" sent to local government officials as being required under WARN, and its suggestion that the sales representatives were considered "employees at the Chester facility,"[8] will undoubtedly be relevant and material to these inquiries, as will the Company's conduct on January 11, 1995.

_____

party opposing summary judgment. See Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S. Ct. 993, 994 (1962)). That we might be able to hypothesize a theory that could conceivably be consistent with what certain declarants intended to say (but did not) is neither our function nor our concern. Rather, our charge is to determine whether "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). We believe that the answer to that inquiry is yes, and that it is not our role as an appellate court to go further. See Ingersoll-Rand Fin. Corp. v. Anderson, 921 F.2d 497, 504 (3d Cir. 1990) ("This court is not a factfinding tribunal.").

Upon review of the entire record, we are constrained by our established jurisprudence to return this proceeding to the district court so that the facts bearing on the "single site" question can be developed at trial.

8. See supra note 3.

18

Given the unorthodox employment arrangements at issue in this case, conclusory statements that the plaintiffs were or were not assigned work "from" Chester, and that they did or did not report "to" Chester, will generally prove inadequate. The problem with such statements is that in our era of modern telecommunications, it is often necessary to distinguish the ultimate origin and destination of information from mere conduits through which the information has passed. An instruction may originate in one location, be routed electronically through another, be stored on a machine in a third, and then be received by an individual located in a fourth. In an unhelpful sense, it can be said that the instruction was assigned "from" any of the first three locations, and that it was sent "to" any of the latter three. Conclusory statements made in this context are likely to interfere with the ability of district courts to enter summary judgment, as they will lead to facially contradictory factual assertions. To avoid this problem in the future, we emphasize that we interpret 20 C.F.R. S 639.3(i)(6) to focus not on the formalities of where certain machines were located, but rather on where the people were who were ultimately responsible for creating and receiving the information. On remand, the district court should focus its inquiry accordingly.

V.

In remanding the "single site" issue to the district court, it is not inappropriate for this court to provide guidance to the district court on the question of damages. See, e.g., Advanced Medical, Inc. v. Arden Med. Sys., Inc., 955 F.2d 188, 200 (3d Cir. 1992). In particular, we feel compelled to consider two questions that were briefed and argued fully before us. These questions are 1) whether the district court erred in holding that the proper baseline measure of damages was two months' salary, and 2) whether the district court correctly held that the severance payments paid by B&W to the sales representatives should not be subtracted from the damage award. Both are legal issues upon which we exercise plenary review.

19

A.

The WARN Act specifies that any employer who violates the Act "shall be liable to each aggrieved employee . . . for . . . back pay for each day of violation at a rate of compensation not less than the higher of [either] the average regular rate received by such employee during the last 3 years of the employee's employment [or] the final regular rate received by such employee." 29 U.S.C. S 2104(a)(1) (West Supp. 1998). This statute requires us to establish the number of days in a given violation, and then multiply that number by an employee's regular rate of pay per day, in order to arrive at a starting point for the damage award owed to each aggrieved employee.9

In United Steelworkers of America v. North Star Steel Co., 5 F.3d 39 (3d Cir. 1993), we interpreted only thefirst part of this formula.10 In that case, we held that the number of days in a given violation period was the number of calendar days in the violation period, rather than the number of actual work days.11 Thus, in a case where there was no

_____

9. This statute provides a starting point because the resulting figure may then be modified by additional considerations as directed by 29 U.S.C. S 2104(a)(1)(B) and 29 U.S.C. S 2104(a)(2)-(7).

10. Judge Seitz, writing for the court, stated the issue in North Star as follows:

> The sole issue appealed by defendant is the number of days for which it must pay damages to its aggrieved employees under Section 2104(a)(1)(A) of WARN. The district court interpreted that section to
> require that defendant pay damages for each calendar day within the violation period. Defendant argues that Section 2104(a)(1)(A) does not require it to pay damages to an aggrieved employee for any day within the violation period that would not have been a regular workday for that employee.

> 5 F.3d at 41.

11. We recognize that some courts have criticized North Star and have rejected its analysis. See Saxion v. Titan-C-Manufacturing, Inc., 86 F.3d 553, 559 (6th Cir. 1996); Frymire v. Ampex Corp., 61 F.3d 757, 772 (10th Cir. 1995); Carpenters District Council v. Dillard Dept. Stores, 15 F.3d 1275, 1283-86 (5th Cir. 1994). However, we are bound to adhere to our prior precedents. See Third Circuit Internal Operating Procedures 9.1.

warning prior to the plant closing or mass layoff, we have held that an employer would be liable for an award covering the full 60 day period specified as a maximum violation period in the statute, rather than a shorter period. See id. at 42-43; 29 U.S.C. S 2104(a)(1). Because the sales representatives here were obviously given no warning prior to their layoffs, an application of North Star to our case directs the conclusion that their damages must be calculated using a 60 day violation period.

The next question we must answer is how to determine an employee's regular rate of pay per day. Because the sales representatives were salaried employees, we must determine how to convert the given annual salary rate into a daily rate of pay. The parties offer competing methodologies. The sales representatives contend that under North Star we must divide the annual salary by the number of days the sales representatives actually worked in a given year. Because the sales representatives were not expected to work weekends or holidays, they claim that the district court's damage award of two months' salary, by eliminating weekends and holidays, represented back pay for only about 40 actual working days (60 days minus weekends and holidays), rather than the full 60 actual working days mandated by North Star.

B&W disagrees with the sales representatives' approach, and insists that the daily rate should be calculated by dividing the annual salary of each representative by 365, the number of days in a year. According to B&W, North Star establishes that the regular daily rate is the pay for each actual working day only for hourly employees. Because salaried employees such as the sales representatives are exempt under the Fair Labor Standards Act and may be forced to work overtime and weekends, B&W argues that a different approach is warranted in the case of salaried employees.

As an initial matter, we note that our North Star precedent was silent as to whether the plaintiffs in that case were hourly or salaried employees of North Star Steel Company. Indeed, North Star offers no guidance on how to convert to a daily rate, either from an annual rate (in the case of salaried employees) or from an hourly one (in the

21

case of hourly employees). The North Star court expressly declined to address this matter, as the parties in that case had stipulated to the daily rate and had asked the court only to decide the number of days in the violation period. See 5 F.3d at 43, 43 n.7. Thus, the sales representatives misconstrue North Star when they claim it supports their approach to calculating a daily rate, and B&W does the same when it attempts to distinguish it on the basis, unstated in the opinion, that the employees in that case were paid on an hourly basis.

After examining the arguments raised by the parties, we agree with B&W -- and the district court -- that the proper way to convert an annual salary rate into a daily rate is simply to divide the annual salary by the number of days in a year. We believe that this approach best serves the Congressional intent because it reflects the reality that a salaried employee is generally hired to perform a particular task, regardless (within reason) of the time required to complete the task. Indeed, to attempt to measure how many days a salaried employee "actually works" in a given year is to engage in needless abstraction. What does it mean to "work a day"? Has an employee who has opted to work twelve hours per day for four days per week worked fewer "days" than another who works eight hours per day for six days per week? We leave these questions for the philosophers.

Accordingly, we hold that the regular daily rate of a salaried employee is the employee's annual salary divided by the number of days in a year.12

B.

The final issue we address is whether the district court correctly held that the severance payments made by B&W

_____

12. The district court's calculations based on the equivalent of two months' salary was almost, but not quite, correct. Because we normally base an annual calculation on 365 days, we think it is the better practice for the district court to divide an employee's annual salary by 365, and then multiply that rate by number of the days of the violation period.

to the sales representatives pursuant to the Company's ERISA plan should not be subtracted from the damage figures. B&W argues that these payments should have been subtracted from the damage figure because they constituted "wages" according to 29 U.S.C. S 2104(a)(2)(A).13 For evidence, B&W points to the fact that the severance payments were labeled "salary continuation" payments, and that they matched the wages that B&W paid when the sales representatives were working.

We find B&W's argument to be without merit. The severance payments made by B&W are not "wages" as contemplated by 29 U.S.C. S 2104(a)(2)(A), but rather ERISA payments that the company was already legally obligated to make regardless of the work the sales representatives performed. The fact that these payments happened to be labeled "salary continuation" benefits, and that they happened to be set at the level of the sales representatives' wages, is irrelevant. The payments made by B&W were not made in exchange for work that the sales representatives would have performed during the period of the violation. Accordingly, they are not "wages" according to 29 U.S.C. S 2104(a)(2)(A), and the district court was correct in refusing to subtract these amounts from the damages award. See 29 U.S.C. S 2104(a)(1)(B) (expressly including

_____

13. 29 U.S.C. S 2104(a)(2) (West Supp. 1998) states:

   The amount for which an employer is liable under paragraph (1) shall be reduced by--

   (A) any wages paid by the employer to the employe e for the period of the violation;

   (B) any voluntary and unconditional payment by th e employer to the employee that is not required by any legal obligation; and

   (C) any payment by the employer to a third party or trustee (such as premiums for health benefits or payments to a defined contribution pension plan) on behalf of and attributable to the employee for the period of the violation.

   In addition, any liability incurred under paragraph (1) with respect to a defined benefit pension plan may be reduced by crediting the employee with service for all purposes under such a plan for the period of the violation.

23

ERISA benefits in WARN damages calculations); Tobin v. Ravenswood Aluminum Corp., 838 F. Supp. 262, 273 n.17 (S.D.W.Va. 1993).

If, after remand, the plaintiffs prevail in this action, the damages must be calculated accordingly.

VI.

We hold that a genuine dispute exists concerning whether the Chester, Virginia administrative center is a single site of employment covered by WARN. Accordingly, we will reverse the January 28, 1997 order of the district court entering summary judgment for the plaintiffs, and will remand for proceedings consistent with the foregoing opinion. As the sales representatives are no longer a "prevailing party" according to 29 U.S.C. S 2104(a)(6), we must also vacate the order of the district court dated September 2, 1997, which had awarded attorney's fees to the plaintiff class.

24

BECKER,* Chief Circuit Judge, concurring and dissenting.

I join in Part V of the majority opinion which provides guidance to the district court on the question of damages. I also subscribe to the majority's conclusion that the determination of plaintiffs' "single site of employment" is governed by 20 C.F.R. S 639.3(i)(6). Nonetheless, I am constrained to dissent from Parts III and IV of the majority opinion since I believe that, under the legal precepts announced therein, the Chester center was clearly the plaintiffs' single site of employment, and that there is no genuine issue of material fact on that question. I would therefore affirm the district court's order granting the plaintiffs' motion for summary judgment on liability.

I.

It will be useful to commence the discussion of the liability issue by rescribing the guidance that the majority imparts to the district court at the close of its liability discussion.

> Given the unorthodox employment arrangements at issue in this case, conclusory statements that the plaintiffs were or were not assigned work "from" Chester, and that they did or did not report "to" Chester, will generally prove inadequate. The problem with such statements is that in our era of modern telecommunications, it is often necessary to distinguish the ultimate origin and destination of information from mere conduits through which the information is passed.
>
> * * *
>
> To avoid this problem in the future, we emphasize that we interpret 20 C.F.R. S 639.3(i)(6) to focus not on the formalities of where certain machines were located, but rather on where the people were who were ultimately responsible for creating and receiving the information. On remand, the district court should focus its inquiry accordingly.

_____

*Honorable Edward R. Becker, United States Circuit Judge for the Third Circuit, assumed Chief Judge status on February 1, 1998.

25

Maj. Op. at 19 (emphasis added). I agree with the majority that in applying 20 C.F.R. S 639.3(i)(6) to this case, a court must be careful to distinguish "mere conduits" from those people "ultimately responsible for creating and receiving the information" from the sales representatives. I dissent essentially because I believe that the majority has failed to faithfully apply its own precepts.

If the majority had done so, it would have been compelled by the evidence to conclude, as the district court already has, that:

> The record in this case establishes, without any genuine dispute, that all instructions, assignments, rules, and orders to the plaintiff salesmen emanated from the Chester Virginia administrative headquarters. [It is not] significant that, to some extent, specific assignments and instructions were issued by way of the district managers, or that plaintiffs' reports to the administrative headquarters were funneled through their district managers.

Ciarlante v. Brown & Williamson Tobacco Corp., No. CIV.A.95-4646, 1996 WL 65448, *2 (E.D. Pa. Nov. 6, 1996) (emphasis added). The highlighted portion of the district court opinion reflects the uncontroverted evidence that both the sales representatives and the sales managers reported back to the Chester center from which they received their assignments and from which all of their day to day needs were handled. In other words, the evidence shows that the sales managers acted as conduits between the Chester center and the sales representatives. It is only by ignoring this evidence, and hence its own admonition to look to who was "ultimately responsible for creating and receiving the information", that the majority can conclude that a genuine issue of material fact is raised by evidence that the sales representatives received instructions from and reported to both the Chester center and their sales managers.

As I will show, this evidence is not in conflict, but instead commands the conclusion that the Chester center was the ultimate site from which the plaintiffs' work was assigned and to which they reported. Since I believe that the evidence is so clear that the Chester center was the site

26

from which plaintiffs' work was assigned and the site to which they reported, I do not deal with whether the Chester center was also their "home base" as that phrase is used in 20 C.F.R. S 639.3(i)(6).

A.

I turn first to whether the Chester center was the site from "which [the sales representatives'] work [was] assigned." 20 C.F.R. S 639.3(i)(6). The majority acknowledges that there is abundant evidence that Chester was the source of plaintiffs' day to day assignments. See Maj. Op. at 14-15. However, the majority finds a genuine issue of material fact on the basis of two pieces of evidence that "conflict" with this view. The first is the statement of Randy Groonwald, a former sales manager in Wisconsin, that the sales representatives in his district "were assigned work . . . by me . . . [and] were not assigned work by anyone in Chester, Virginia." App. 1018. The second is the following snippet from the deposition of Thomas A. Marshall, a named plaintiff, and former sales representative:

> Q. Did you ever take any orders from anyone at the administrative center down in Chester, Virginia?
>
> A. No, I didn't.

App. 2270.

As I will show, however, Groonwald's statement conflicts with the view that Chester was the ultimate source of the sales representatives' assignments only if one ignores, as the majority apparently has, the uncontroverted evidence that the Chester center was the source of assignments for both the district sales managers and the sales representatives. Marshall's testimony, when placed in context, not only does not create a genuine issue of material fact, but strongly counsels in favor of summary judgment for the plaintiffs.

1.

Marc Lowery and Dwight Hughes, former employees at the Chester center, described the process by which

27

assignments were distributed to American Tobaccofield sales personnel. Lowery declared that:

> [My job was] to coordinate and issue, out of the Chester office, all releases, bulletins and instructions to the field sales organization, including the field sales representatives and the district sales managers. These included the day-to-day instructions, assignments and procedures to be followed by the field sales representatives and district sales managers.
>
> * * *
>
> It was through these letters and instructions coming from the Chester office that field salespersons were told what specific products management wanted them to sell and promote and how they were to do it through specific promotional strategies that they must use. These instructions in the form of "Sales Coverage" letters were regularly issued from the Chester office every five (5) to eight (8) weeks.

App. 2209-10. (emphasis added).

Similarly, Hughes stated that:

> Sales representatives and district sales managers received their instructions and assignments in the form of written memos or letters that we called `field sales information,' `sales campaign,' or `sales coverage' letters. These instructions and assignments were generally issued in mass mailings [from the Chester Office].

...

> [These letters] told the sales representatives and district sales managers what to sell and how to sell it.

App. 2186. (emphasis added).

As the foregoing makes clear, Groonwald's statement that the sales representatives in his district "were assigned work . . . by me . . . [and] were not assigned work by anyone in Chester, Virginia" is easily reconciled with the evidence that the Chester center was the ultimate source of all of plaintiffs' assignments. The fact is that nowhere in

28

Groonwald's affidavit does he contradict the evidence that, like all sales mangers, he received the day to day assignments that he gave to his sales representatives from the Chester office. Thus, at most, Groonwald's affidavit indicates that he served as a conduit between Chester and his sales representatives. As the majority noted, mere conduits must be disregarded in the effort to determine the ultimate source of plaintiffs' day to day assignments.

2.

The majority also relies on the following portion of Thomas Marshall's deposition:

> Q. Did you ever take any orders from anyone at the administrative center down in Chester, Virginia?
>
> A. No, I didn't.

This excerpt, when returned to its proper context, provides no support for remand.

First, a review of the testimony preceding the excerpt makes clear that when Marshall stated that he did not receive instructions from anyone at Chester, he simply meant that he did not receive instructions from any particular person at Chester:

> Q. You didn't answer my question. Who in Chester, Virginia did you report to?
>
> A. Well to the company itself.
>
> Q. So there is no person that you reported to there?
>
> A. There is no person.
>
> Q. So you did not have a boss in Chester, Virginia; is that right?
>
> A. Well, there's lots of bosses in Chester, Virginia.
>
> Q. Was there a particular person, a boss that told you what to do in Chester, Virginia, that you --
>
> A. No.
>
> Q. -- can identify today?

29

A. No.

App. 2260.

More fundamentally, the overall content of Marshall's testimony unequivocally supports the view that the sales representatives received their assignments from the Chester center. Nowhere is the imprudence of the majority's reliance on Marshall's testimony to preclude summary judgment more in evidence then in the following exchange:

Q. You make a distinction between supervising and reporting; is that right?

A. Yes, I think I do.

Q. Now, explain that to me, in your own words.

A. Well, I believe that there were supervisors, supervising the sales reps in the field. But I think that the sales reps, we were instructed by the [Chester] office, and the office seemed to have full control of us. Anything we did out there seemed to relate to the office. I could not get hold of Mr. Ogorek [his sales manager] if I wanted to, except on voice mail.

Tom Ogorek didn't tell me what to do out there in the field. I was sent a campaign letter from Chester, Virginia stating what I was to do, and how long I was to do it, how much I was to spend, and the brands I was to work. They made the changes in the field. If there was an executive order out there changing our field operation, it came from voice mail.

App. 2260. (emphasis added)

In short, none of the evidence relied on by the majority conflicts with the view that the ultimate source of the sales representatives' assignments was the Chester center.

B.

While a determination that the plaintiffs' work was assigned from the Chester center is, by itself, a sufficient basis on which to affirm the district court, see Maj. Op. at

30

10-11, I also believe that the majority errs in concluding that there is a genuine issue of material fact as to whether the Chester center was the site to "which [the sales representatives] report[ed]." 20 C.F.R.S 639.3(i)(6). The majority reaches this conclusion by finding a conflict between, for example, the statement of Mark Lowery, who worked at the Chester center from 1986 to 1995, that "[t]he Chester office is where all reported information flowed and . . . where it all ended up" and the statement of Randy Groonwald that the sales representatives in his district "hand-delivered or mailed to me daily call summaries detailing their activities [every] week," and that they "did not report to anyone in Chester, Virginia." However, it is only by ignoring the import of evidence critical to its inquiry -- evidence that the sales representatives reported to Chester through the sales managers -- that the majority is able to find a conflict between these statements.

The role of the sales managers in the American Tobacco "reporting process", is best summarized by Joseph Pierce, the former head of Sales Audit and Analysis for American Tobacco:

> I understand that in earlier years the original expense report forms were mailed directly to the Chester office from the homes of each field sales representative, which resulted in our receiving a thousand or so separate envelopes from all over the country. Eventually, we used the district sales managers to collect the original report forms from the field sales representatives in their group, and the district sales managers would send the originals to the Chester office, which resulted in our receiving only about 150 or so envelopes (the number of district sales managers) from fewer locations.
>
> In this regard the district sales manager assisted the Chester office, to the extent they eyeballed the forms, unstapled papers, matched the receipts to the proper form, and otherwise organized the paperwork in a form that made it easier for our staff in the Chester office to review and analyze each of the approximately 1,000 field sales representative's expense reports and paperwork. Even after we started using the district

31

sales managers to funnel the paperwork from the field to the Chester Office, it was still the Chester Office which reviewed and analyzed the field sales representatives' expense reports and approved for processing (or disapproved) the reports.

App. 2202- 03. (emphasis added).

Pierce's statement is confirmed by other evidence that makes clear that all of the plaintiffs' reports (be they sales or expense reports) ultimately flowed to the Chester center, and that, to the extent that the district sales managers helped funnel the information from the field, they were assisting and facilitating the work of the Chester center. Based on this understanding of the American Tobacco "reporting process", I believe that there is no genuine issue of fact that the sales managers were merely conduits through which the plaintiffs reported to the Chester center, and thus that the Chester center was the site to which the plaintiffs' reported. I would affirm the district court on this basis as well.[1]

C.

Out of an abundance of caution, I address the contention, raised by the defendants, that the Chester center itself was just a conduit since the assignments that it sent to the field personnel and the reports that it received were passed through it to the executive offices of American Tobacco located in Stamford, Connecticut. The majority does not focus on this possible view of the evidence and instead frames the choice of plaintiffs' single site of

_____

[1] I am not sure what to make of the majority's statement at the outset of this section that its "inquiry focuses on the location of the personnel who were primarily responsible for reviewing[the plaintiffs' reports]." Maj. Op at 16 (emphasis added). While I believe that the personnel at the Chester center were both primarily and ultimately responsible for reviewing the reports, I am uncertain as to how much of the majority's analysis turns on a distinction between these two terms -- or even whether the shifting terminology is intentional. At all events, I believe that this inconsistency should not affect the majority's instruction to the district court to focus its inquiry on remand on those "ultimately responsible for creating and receiving the information."

32

employment as being between the Chester center and the geographical districts in which the plaintiffs' worked. However, I address this argument, because the defendants may attempt to revive it on remand.

While there has been insufficient factual development for us to determine whether in fact the Stamford office was the location "of the people who were ultimately responsible for creating and receiving the information" from the plaintiffs, I do not believe that such development is necessary to the disposition of this case. Even if the defendants were to succeed in showing that the Stamford office, rather than the Chester center, was the plaintiffs' single site of employment, the defendants would still be liable under the WARN Act, as a matter of law, since the "mass layoff" would still have resulted "in an employment loss at the single site of employment . . . for . . . at least 50 employees." See 29 U.S.C. S 2101(a)(3)(B).

D.

Before concluding, I must consider the broader, policy-based aspect of the issue. This is the first time that a court has been asked to apply 20 C.F.R. S 639.3(i)(6) to determine the single site of employment for a geographically dispersed workforce that does not physically report to any site of employment at any time. Cf. Wiltz v. M/G Transport Services, Inc., 128 F.3d 957 (6th Cir. 1997) (issue was whether separate towboats on which plaintiffs lived during 30 day assignments or defendant's main office to which over 80% of the crews physically reported for assignments to towboats was single site of employment pursuant to 20 C.F.R. S 639.3(i)(6)); Teamsters Local Union 413 v. Driver's, Inc., 101 F.3d 1107 (6th Cir. 1996) (issue was whether eleven separate trucking terminals to which plaintiffs physically reported could be combined to constitute one single site of employment under the Act).

The majority observes that the employment arrangement at issue is "unorthodox." See Maj. Op. at 19. I take this to mean that it believes that this case represents something of an outlier. I disagree. Rather, I suspect that such situations represent the new frontier in WARN Act litigation. In the

33

next decade, technology will permit workers of all types, not just salespeople or other mobile workers, to escape the physical confines of traditional offices. I acknowledge that the majority has recognized the possibility that such plaintiffs may prevail within the framework of 20 C.F.R. S 639.3(i)(6), hence the remand here for further proceedings. However the tenor of the majority opinion, and its refusal to affirm the grant of summary judgment for plaintiffs on what I believe to be an unequivocal record, sends the opposite (and wrong) message and, I think, establishes bad precedent.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit